**POCONO MOUNTAIN CHARTER SCHOOL, INC. d/b/a Pocono Mountain Charter School, Petitioner**

v.

**POCONO MOUNTAIN SCHOOL DISTRICT, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Dec. 11, 2013.
Decided Feb. 26, 2014.
Reargument En Banc Denied March 27, 2014.

Daniel Fennick, York, for petitioner.

Ellen C. Schurdak, Bethlehem, for respondent.

BEFORE: SIMPSON, Judge, COVEY, Judge, and COLINS, Senior Judge.

OPINION BY Judge SIMPSON.

In this statutory appeal with unique procedural twists, Pocono Mountain Charter School, Inc. d/b/a Pocono Mountain Charter School (Charter School) petitions for review of the State Charter School Appeal Board's (CAB) 2013 order revoking its charter. The CAB thus upheld the Pocono Mountain School District's (District) school board's (Board) adjudication.

Originally, the CAB stated there was insufficient basis for revocation, and it voted to sustain the Charter School's appeal. Upon the District's application to reconsider and reopen the record, the CAB rescinded its prior vote and accepted supplemental evidence. Subsequently, the CAB issued the decision and order revoking the charter. The CAB concluded the Charter School violated the Charter School Law (CSL)[1] based upon religious entanglement with its landlord, the Shawnee Tabernacle Church (Church), expending public funds for sectarian purposes, exposing students to religious symbols, and failing to meet generally accepted standards of fiscal management.

The Charter School argues the proceedings violated its constitutional due process rights at both levels of administrative review. Upon review, we vacate and remand to the CAB in accordance with the following opinion.

## I. Background

### A. The Charter School and Church Relationship

In 2003, Dennis Bloom (Bloom) submitted the charter application on behalf of the

---

1. Act of June 19, 1997, P.L. 225, *as amended,* 24 P.S. §§ 17–1701–A—17–1751–A.

Charter School and became its first Chief Executive Officer (CEO). Since it opened, the Charter School leased space from the Church. The Church operated in the same building and shared facilities with the Charter School. Significantly, Bloom simultaneously served the Charter School as CEO and the Church as Senior Pastor. Bloom thus represented the Church while also representing the Charter School, including in business deals where their interests diverged (e.g., lease negotiations). The Charter School also employed Bloom's wife and his children at certain times.

In 2006, the District renewed the Charter School's charter for five years, subject to 65 conditions. At that time, the District knew of the Charter School's relationship with the Church and of Bloom's dual role. It challenged neither.

The District initiated revocation proceedings in May 2008. The revocation resolution concerned religious entanglement and financial improprieties of Bloom given his apparent conflicts of interest.

Bloom resigned from his position as CEO in December 2010, two months after the Board issued its adjudication revoking the Charter School's charter. However, benefits Bloom received from the Charter School did not completely terminate upon his resignation.

The parties do not dispute that the Charter School is working to remedy its financial history with a Court-monitored custodian. Judge Arthur L. Zulick of the Court of Common Pleas of Monroe County is monitoring the financial and educational status of the Charter School.

## B. Procedural Overview

The timing of events is important. In May 2008, the District adopted a resolution containing 27 reasons to revoke the charter.[2] In June 2009, the Board commenced public hearings on the revocation. Primarily, the hearings focused on the alleged unconstitutional entanglement between the Charter School and the Church. The hearings also involved alleged financial mismanagement and improper expenditures by then-CEO Bloom.

After holding 16 hearings over a year's time, on October 6, 2010, the Board issued an adjudication to revoke the charter. The Charter School appealed to the CAB.

On September 27, 2011, at a public meeting, the CAB acted on the revocation. By majority vote, the CAB sustained the Charter School's appeal. The CAB did not issue a written decision explaining its disagreement with the Board.

Significantly, the Charter School received a confidential draft copy of a Performance Audit Report from the State Auditor General in December 2011. Before the CAB issued a written decision in support of its September action, in January 2012, the District sought reconsideration of the CAB's action and moved to reopen the record for the purpose of admitting the anticipated final audit (referenced by an article in The Morning Call ). Supplemental Reproduced Record (S.R.R.) at 52b–53b, 60b. The District revised its request to reopen the record to include the Performance Audit Report issued on February 8, 2012 (Final Audit). The Final Audit covered transactions from July 2006 through August 2010.

2. At a public meeting, the District approved pursuing revocation for three reasons: discrimination based on intellectual ability; improper classification of special needs students; and, failure to develop a school improvement plan regarding failure to meet adequate yearly progress (AYP) goals. The District subsequently expanded these grounds in its written revocation notice.

By order dated February 29, 2012, the CAB rescinded its September 2011 vote, and it reopened the record to accept the Final Audit and any supplemental evidence related to its findings. The CAB remanded evidentiary issues to a hearing officer who made findings as to the supplemental evidence only.

After receiving the hearing officer's proposed findings, the CAB voted 6–0 in favor of revocation on July 30, 2013. It issued its written decision and order three days later. The Charter School promptly filed a petition for review and motion for stay, which this Court granted. Although its charter expired in 2011, the Charter School continues to operate pursuant to this Court's stay of the CAB's revocation decision.

In an effort to shed light on the many due process challenges and clarify the complex procedural history, we review the proceedings at each administrative stage in more detail.

### 1. Revocation Hearings (District Board)

The District's written resolution detailed 27 reasons for scheduling a hearing to revoke the Charter School's charter. Among the 27 grounds, the Board identified the following issues:

1. Entanglement of the Church with the Charter School's operations;

2. Excessive CEO Benefits and Salary;

3. Violations of State Ethics Law by employing Bloom's relatives, including his wife and children, creating conflicts of interest;

4. Benefit to Bloom or improper financial benefits to the Church, (payment of excessive rent and fees, *e.g.*, gym floor, LED sign used to display messages);

5. Paying more than fair market value rates for rent, and failing to negotiate at arm's length; and,

6. Operating Charter School to constitute an alter ego of the Church, its landlord.

*See* Reproduced Record (R.R.) at 150a–152a (Revocation Resolution). Prior to hearing, the parties engaged in discovery. Over the course of a year, the Board conducted 16 hearings, resulting in 2,000 pages of transcribed testimony.

The evidence during the revocation hearings revealed the following facts. The District renewed the charter for a period of five years, until 2011. R.R. at 16a–25a. After renewal, the District became concerned the Charter School did not comply with its charter. The District sent a letter dated April 10, 2007, seeking information to ensure charter compliance. The letter advised the Charter School that if it did not provide the requested information within 60 days, revocation proceedings may be commenced. S.R.R. at 752b–754b. The Charter School responded without disclosing its renegotiations of its most recent lease with the Church.

While simultaneously serving as CEO of the Charter School and Senior Pastor of the Church, Bloom transacted business for both entities related to the property they shared. This included signing leases with the Charter School on behalf of the Church, and undertaking the efforts for the LED message board sign, which displays Church and Charter School announcements.

The Church and the Charter School signed the Master Lease Agreement (Lease) on July 9, 2007. After the revocation process began, the Charter School disclosed the Lease. Pursuant to the Lease, the Charter School paid $18,756.56 per month to the Church for space that was under construction and uninhabitable.

This rent was in addition to the $33,000.00 per month the Charter School paid for use of the original 30,000 square foot building, and the annual payment of $36,000.00 in rent for the athletic fields. The Lease restricted the Charter School's access to the premises to Monday through Friday, from 7:00 a.m. to 5:00 p.m., only on those days when school was in session. The Charter School did not have an appraisal when it executed the Lease or Lease amendments. There is no indication in the Charter School minutes that the Board of Trustees of the Charter School approved the Lease.

The Charter School spent more than $1.6 million on buildings and improvements for the year ending June 30, 2008. R.R. at 75a. For the year ending June 30, 2007, the Charter School expended approximately $970,000.00 for facilities, acquisition and construction-related costs associated with the Church's property. R.R. at 35a. The expenditures include approximately $125,000.00 for a gymnasium floor with 30-inch high lettering spelling "SHAWNEE TABERNACLE," S.R.R. at 780b–801b, and nearly $40,000.00 for a LED message sign to be placed at the end of the property along a public roadway. The name of the Church appears permanently at the top of the sign, and the name of the Charter School is below the mes-sage screen. At times, the sign posted religious messages as follows: "Did you remember Jesus Today? He remembers you[,]" "Come Home! God[,]" and "Jesus is the truth and the light" (Religious Messages). S.R.R. at 843b–853b. The Church did not make any payment toward the sign.

One of the Charter School's experts as to real estate appraisal (Appraiser) conceded the lease agreements between the Church and Charter School did not constitute arm's length transactions given Bloom's relationship to both parties. S.R.R. at 173b–174b; 177b; 180b–181b. Although he defended the rent as reasonable, Appraiser did not review any local charter school lease agreements to develop an opinion as to fair market value for the rent. When determining fair market rental value, Appraiser also did not consider the costs that the Charter School paid for substantial improvements. Appraiser also did not consider the age of the building, or use comparable properties, or take into account that the Lease limited use to certain days and hours.

Moreover, Bloom and his family also received allegedly excessive benefits as a result of his dual role. CEO Bloom and members of his family received payments or other benefits directly from the Charter School or through the Church.

The Church established a separate, non-profit corporation known as Tobyhanna Impact Athletic Center, listing Bloom's daughter as President. The Athletic Center charged the public for use of the gym. Despite receiving payments, the Athletic Center did not pay the Charter School for use of the gym. Thus, it received an indirect benefit from the Charter School.

Bloom's wife served as Assistant CEO of the Charter School until 2008. The Charter School paid her a salary of more than $67,000.00 for the 2006–07 school year, and $76,000.00 for the 2007–08 school year. The Charter School previously employed Bloom's daughter and son. Bloom's daughter received a bonus from the Charter School. There is no evidence of the Board of Trustees' approval of this bonus.

Further, Bloom did not have experience in instructional leadership, regulatory compliance, contract negotiation or personnel administration. Despite these deficiencies, Bloom received an annual salary of $107,993.00 for the 2006–07 school year,

and \$120,000.00 for the 2007–08 and 2008–09 school years.

In its adjudication dated October 6, 2010, the Board voted to revoke the Charter School's charter. The Board concluded the Charter School repeatedly engaged in transactions that resulted in an inappropriate entanglement of the Charter School's operations with the Church in violation of Section 1715–A(4) of the CSL, 24 P.S. § 17–1715–A(4), which states, "a charter school shall be nonsectarian in all operations." The Board also concluded the Charter School violated Section 1715–A(5) of the CSL, 24 P.S. § 17–1715–A(5), prohibiting exposure of students to religious objects and symbols on school premises. Lastly, the Board held the Charter School failed to meet generally accepted standards of fiscal management as required by Section 1729–A (a)(3) of the CSL, 24 P.S. § 17–1729–A (a)(3).

### 2. CAB Proceedings

The Charter School appealed the Board's adjudication to the CAB. Before the CAB, the parties filed a number of motions regarding supplemental evidence, consolidation with non-renewal proceedings,[3] and alleged noncompliance with hearing officer orders. A hearing officer ruled on a number of the procedural motions. The Charter School petitioned to reopen the record to include evidence of the public support for the school, and

changes subsequent to CEO Bloom's resignation, including removing signs of its affiliation with the Church. The District petitioned to submit evidence post-dating the adjudication. The CAB denied both parties' petitions.

On September 27, 2011, a majority of the quorum of the CAB voted at a public meeting to reverse the Board's decision revoking the charter (CAB–1).[4] In that meeting, then-Secretary of Education Ronald J. Tomalis called for a final roll call vote. Then–Secretary Tomalis made a statement recorded in the meeting minutes as follows: "[U]pon review and careful consideration of the matter, he concluded the record did not contain substantial evidence supporting the District's grounds for revocation which were improper religious entanglement, exposure of students to religious symbols or objects, and disbursement of funds for non-Charter School purposes." R.R. at 344a. The CAB–1 then voted 5–2 against revocation.

The CAB did not issue a written decision explaining its disagreement with the Board. In November 2011, the Charter School contacted the CAB's counsel regarding status of a written decision. Counsel replied the opinion would be forthcoming, stating the office was "really inundated." R.R. at 313a.[5] There was no indication of a change in the decision, or reason to question its reliability.

---

3. While revocation proceeded, in April 2011, the District issued a notice of nonrenewal of the charter. The District opposed the Charter School's motion to consolidate the revocation and nonrenewal proceedings. The nonrenewal process would permit evidence of events that transpired between the revocation charges in 2008 and the notice of nonrenewal in 2011. In its answer to the motion to consolidate, the District explained the revocation appeal is separate from any decision to renew or not renew the charter. Nonrenewal proceedings are being held in abeyance.

4. The Charter School refers to the first constitution of the CAB, which voted in its favor, as "CAB–1" and the second constitution of the CAB, which rescinded CAB–1's vote, and revoted to revoke its charter as "CAB–2." We adopt these terms.

5. This email exchange is not part of the certified record.

In January 2012, the District sought reconsideration and petitioned to reopen the record. The District amended its petition to reopen the record once the Auditor General issued the Final Audit in February 2012. The District offered three bases for its application to reopen the record: (1) Section 1729–A(d) of the CSL permits the CAB to accept supplemental information that was "previously unavailable;" (2) the General Rules of Administrative Practice and Procedure (GRAPP), Title 1 Pa.Code, Part II, Chapters 31–35; and, (3) case law holding an agency may reopen a record if reopening would result in a more accurate adjudication, citing *Al Hamilton Contracting Co. v. Department of Environmental Resources,* 659 A.2d 31 (Pa.Cmwlth.1995).

The Charter School filed a motion to quash the District's application.

After hearing argument on the application to reopen, the re-constituted CAB–2 unanimously voted to grant the District's application, by order dated February 29, 2012. Accordingly, the CAB–2 rescinded the vote from September 2011. The CAB also admitted the Final Audit into evidence.

In the Final Audit, the Auditor General concluded the Charter School may have engaged in improper entanglements with the Church.[6] The Final Audit also concluded the Charter School may have engaged in related party financial transactions and conflicts of interest. The Final Audit also noted the Charter School lacked a memorandum of understanding with the local police department.

The CAB–2 offered the parties an opportunity to submit additional proposed findings related to the Final Audit.

Both parties submitted supplemental information in the form of exhibits to the CAB. The Charter School submitted evidence to refute the Final Audit. Among the submissions, the Charter School responded that Bloom resigned as CEO in late 2010. The Charter School admitted its Board of Trustees minutes were incomplete and that Statements of Financial Interest were not filed.

The District also submitted rebuttal exhibits pertaining to the period after Bloom's resignation. The Charter School declined to do so. The parties stipulated to the submission of all the exhibits, and withdrew related objections. The parties agreed to brief the probative value of the exhibits separately.

Based on the voluminous supplemental submissions, and on the parties' opposition to certain submissions, the CAB–2 appointed a hearing officer. As part of the appointment, the CAB–2 provided the hearing officer with all submissions subsequent to the order permitting supplemental evidence. The CAB–2 advised the hearing officer to determine the admissibility of documents, for which she "may take testimony for authentication purposes." R.R. at 461a (CAB letter dated July 17, 2012 remanding to hearing officer).

The parties argued the admissibility and relevance of the supplemental evidence. The CAB–2 noted the hearing officer would provide supplemental findings based

---

**6.** Among the entanglements, the Final Audit listed the following: purchase of gym equipment from the Church for approximately $40,000.00; limiting the Charter School's access to the leased property; requiring the Charter School to pay rent for space that was under construction; and, increasing the Charter School's rent from $259,000.00 in June 2003 to $929,000.00 in 2007, when the Charter School paid for the expansion of the building. Further, the Final Audit noted it did not appear the lease agreements were approved in a public process.

on the supplemental materials she reviewed. To that end, after receiving briefs, the hearing officer issued Proposed Findings of Fact, recommending a decision in the District's favor on April 30, 2013.

During a public meeting on July 31, 2013, the CAB-2 then re-voted, 6–0, to revoke the charter. The CAB-2 issued a written decision three days later, containing 141 findings of fact. Findings 1 through 89 pertained to the evidentiary record the Board developed in the revocation hearings. Findings 90 through 141 pertained to the supplemental evidence "Regarding Auditor General's Report." CAB-2 Op., 8/2/13, at 10.

The CAB-2 decided the Charter School's procedural arguments lacked merit. Specifically, it held the proceedings comported with the notice and specification requirements in the CSL, permitting the Charter School to "successfully" mount a defense. CAB-2 Op. at 19. It also ruled conditions to the charter did not increase the notice criteria that are set forth in and governed by the CSL. See Section 1729–A(c) of the CSL, 24 P.S. § 17–1729–A(c).

Substantively, the CAB-2 concluded the Charter School "violated [24 P.S.] § 17–1715–A (4) by impermissibly entangling its operations with [the Church]." CAB-2 Op. at 17. It stated the displays of the Church name and logo, and Religious Messages on the LED sign constituted intentional exposure to religious items, and such displays violate Section 1715–A(5) of the CSL, 24 P.S. § 17–1715–A(5). The CAB-2 also reasoned the expenditures of public funds for a sectarian purpose and related

financial mismanagement violated the CSL.

CAB-2's analysis appeared to rely, at least in part, upon the supplemental evidence, including the Final Audit and related submissions.

### C. Petition for Review

The Charter School filed a petition for review and motion for stay with this Court. A stay was granted after argument. See *Pocono Mt. Charter Sch. v. Pocono Mt. Sch. Dist.*, (Pa.Cmwlth., No. 1308 C.D. 2013, filed August 13, 2013) (single judge op., Simpson, J.) (unreported).[7]

In its petition for review, the Charter School alleges violations of its due process rights in a number of respects. Primarily, the Charter School argues the Board and CAB decisions were not authorized by the CSL, and the decisions were invalid for failing to conform to procedural and evidentiary requirements. The Charter School also asserts the CAB lacked authority to admit the Final Audit and related submissions. Lastly, the Charter School contends the CAB's adjudication was not based on substantial evidence because it relied on improperly received evidence that does not meet the standards for admissibility.

### II. Issues

The Charter School challenges the CAB decision for a number of reasons,[8] primarily alleging due process violations at both levels of administrative review. The Charter School contends the revocation proceedings before the Board violated due process. The Charter School also argues

---

7. The District filed a petition for review of this decision, which our Supreme Court denied by order dated December 5, 2013, (Pa., No. 126 MM 2013, Dec. 5, 2013).

8. The Charter School identified 15 different "Questions Presented" in its brief. Pet'r's Br. at 4–5. As many questions shared common themes, we reframed and consolidated the issues. We grouped them thematically by the administrative stage and evidentiary issues.

the CAB violated its due process rights and abused its discretion in reopening the record to accept supplemental evidence and in re-voting after initially voting in the Charter School's favor. Lastly, the Charter School asserts the CAB's decision is not supported by substantial, competent evidence.

## III. Discussion

■ This Court is obliged to affirm the CAB's determination unless we determine that the adjudication is in violation of constitutional rights, is not in accordance with the law, or is not supported by substantial evidence. *See Cmty. Serv. Leadership Dev. Charter Sch. v. Pittsburgh Sch. Dist.*, 34 A.3d 919 (Pa.Cmwlth.2012); *Shenango Valley Reg'l Charter Sch. v. Hermitage Sch. Dist. & Sharon City Sch. Dist.*, 756 A.2d 1191 (Pa.Cmwlth.2000) (citing Section 704 of the Administrative Agency Law (AAL), 2 Pa.C.S. § 704).

## A. Due Process in Board Proceedings

The Charter School argues the revocation hearings violated its procedural due process rights because the District did not provide sufficient notice of the charges. The Charter School claims the revocation resolution is not valid because its contents were not approved at a public meeting. Specifically, the Charter School challenges the increase of the grounds from three approved at a public meeting to 27 grounds in the written notice. The Charter School also asserts it is entitled to 60 days' notice to cure any violations, which the District did not provide. Finally, the Charter School disputes some of the Board's evidentiary rulings.

The District responds that it provided sufficient notice of the charges, permitting the Charter School a full opportunity to address them during 16 hearings. The District also refutes the alleged invalidity

of the revocation resolution when the District certified approval and accuracy of the resolution. As to the charter's 60–day notice provision, the District responds it provided notice of the alleged charter violations in May 2008, and the Charter School did not attempt a cure until 2010.

■ The Charter School has a protected property interest in its existing charter that implicates constitutional due process. *Northside Urban Pathways v. Charter Sch. Appeal Bd.*, 56 A.3d 80, 84 (Pa.Cmwlth.2012). Any adverse government decision with respect to a license—here, revocation of a charter—must be subject to review, under due process and the Pennsylvania Constitution. *Cmty. Acad. of Phila. Charter Sch. v. Phila. Sch. Dist. Sch. Reform Comm'n*, 65 A.3d 1023, 1029 (Pa.Cmwlth.2013) (citing *Phila. Entm't & Dev. Partners L.P. v. Pa. Gaming Control Bd.*, 34 A.3d 261, 276 (Pa. Cmwlth.2011) (noting that "some form of due process is required when an administrative agency revokes one's right to transact business in the Commonwealth.")).

### 1. May 2008 Revocation Notice

■ The notice of revocation must contain reasonable specificity and give a charter school reasonable notice of the grounds. Section 1729–A(c), 24 P.S. § 17–1729–A(c). Local agencies (such as the District) must also provide reasonable notice of a hearing and an opportunity to be heard. 2 Pa.C.S. § 553. Adequate notice for due process purposes "requires *at a minimum* that the notice contain a sufficient listing *and explanation* of the charges against an individual." *Caba v. Weaknecht*, 64 A.3d 39, 64 (Pa.Cmwlth. 2013) (emphasis in original).

■ Here, the parties engaged in discovery regarding the revocation charges. The hearing officer issued an order requiring the District to provide additional detail

about the charges. The Charter School contends the District failed to comply with this order, and thus provided insufficient specificity.

■ Regardless of the District's level of compliance with the hearing officer's order, the notice complied with the CSL. Also, the Charter School points to no harm caused by the alleged non-compliance. "The mere demonstration of a potential procedural error, without also alleging a resulting harm, is not sufficient reason to disturb an agency adjudication." *D.Z. v. Bethlehem Area Sch. Dist.*, 2 A.3d 712, 719 (Pa.Cmwlth.2010). The Charter School fully litigated the grounds during the 16 hearings. Accordingly, this Court does not discern a due process violation in the alleged vagueness of the May 2008 revocation notice.

### 2. May 2008 Revocation Resolution

The Charter School claims that the District's revocation motion was oral, and only three issues were specified in the minutes approving the motion. None of those three issues was included in the subsequent written revocation resolution. The Charter School therefore contends the Board never authorized the revocation resolution.

There is no dispute that the charges ultimately cited in the written revocation notice did not correspond to the minutes from the public meeting where the District voted on revocation. R.R. at 545a. The minutes do not reflect the substance of the 27 revocation grounds in the written notice.

The Sunshine Law, 65 Pa.C.S. §§ 701–716, requires minutes to be kept of all "official actions." An official action includes the District's vote on revocation. 65 Pa.C.S. § 703. Based on the record, the District's board of directors voted on only three revocation grounds at a public meeting during which the revocation motion was considered.

■ Nevertheless, the fact that the 27 grounds are not memorialized in the District's minutes does not invalidate the revocation resolution. This is because the alleged violation of the Sunshine Law is not properly reviewed by this Court in this procedural posture. The courts of common pleas have original jurisdiction over open meeting challenges for local agencies. 65 Pa.C.S. § 715.

The Charter School's remedy for a Sunshine Law violation is statutorily limited as follows: "a legal challenge under this chapter shall be filed *within 30 days* from the date of a meeting which is open, or within 30 days from the discovery of any action that occurred at a meeting which was not open at which this chapter was violated." 65 Pa.C.S. § 713 (emphasis added). Section 713 also sets a one year statute of limitations in the event a meeting was not open. *Id.*

The resolution met the standards for notice set forth in the CSL. Because it is clear the Charter School had notice of the charges ultimately litigated, and the revocation resolution is certified by the Secretary of the District's board of directors, the revocation notice is valid and may not be collaterally attacked here.

### 3. Charter Condition (60 Days to Cure)

According to condition number 65 in its charter, the Charter School is entitled to notice and a 60–day cure period for any violations of its charter. The cure provision is triggered by the District's notice of charter violations. The parties' dispute concerns the operative date of the "notice."

The Charter School construes the notice of charter violations as the Board's October 2010 adjudication. Under this con-

struction, the Charter School had until December 2010 to cure the violations. The Charter School undertook efforts to cure at that time with Bloom's resignation and removal of Church signage.

We disagree with the Charter School's interpretation. The 60–day notice period is properly calculated from the May 2008 written revocation notice. The revocation notice alerted the Charter School to alleged deficiencies at a time when it could still forestall lengthy litigation and revocation. The much later issuance of the Board's adjudication on revocation after 16 hearings completed the process.

Further, the Charter School did not submit evidence of attempts to cure the allegations within 60 days of receiving notice in May 2008. Rather, the Charter School elected to litigate the revocation grounds. It was only after the Board issued its adjudication that the Charter School attempted to remedy the alleged charges, starting with the resignation of Bloom in December 2010. For these reasons, the Charter School's argument on this point lacks merit.

### 4. Miscellaneous Evidentiary Challenges

The Charter School's remaining arguments are addressed in summary fashion. Because the Board heard evidence of facts that occurred after the May 2008 revocation resolution, the Charter School asserts lack of notice. Additionally, the Charter School contends the Board erred in admitting evidence that lacked foundation.

During the revocation hearings, the District submitted pamphlets allegedly distributed by the Charter School on Election Day in November 2008. Although it postdated the revocation notice, the Charter School had sufficient opportunity to challenge this evidence before the Board. Moreover, as their admission did not ap-

pear to prejudice the Charter School or affect the ultimate outcome, we discern no basis for reversal on this issue.

■ Photographs depicting the Religious Messages on the LED sign were admitted over objection. The Charter School alleges lack of foundation for their admission when the witness did not take the photos, and it is unclear when they were taken. The witness only confirmed the photos depicted the LED sign, and noted its message changes. *See* Board's Certified Record, Volume II of IV, Bd. Hr'g Tr., 3/29/10, at 1994 (prior president of Charter School's Board of Trustees).

These challenges go to the weight to be accorded the photos, which is beyond this Court's purview on appellate review. *Wilson v. City of Phila., Bd. of License & Inspection Review*, 16 Pa.Cmwlth. 586, 329 A.2d 908 (1974). Although reliance on improper evidence is error, the Charter School fails to connect these evidentiary rulings to the ultimate outcome, and they are but two of hundreds of exhibits admitted during the revocation hearings. Thus, reversible prejudice is unclear at best.

### B. CAB Procedural Irregularities

The Charter School contends the CAB did not abide by the procedures set forth in the CSL. The Charter School argues the CAB denied it due process by: (1) failing to issue a written adjudication in accordance with the CSL and rescinding its final vote without explanation; (2) reopening the record without authority; and, (3) restraining the type of process conducted by the hearing officer to eliminate cross-examination on crucial facts in the Final Audit. The Charter School also asserts the Acting Secretary lacked authority to act for the CAB.

The District responds the CAB had no obligation to issue a written revocation

decision within a specific timeframe. Alternatively, the Charter School had the burden of seeking mandamus to compel a written decision. As to the Final Audit, the District maintains the CAB had the discretion to permit previously unavailable evidence. The District asserts the Charter School waived its argument as to the Acting Secretary, having omitted it from the petition for review.

■ The CAB is not bound by the school district's findings regarding a charter as it may substitute its own findings and judgment for that of the school board. *W. Chester Area Sch. Dist. v. Collegium Charter Sch.*, 760 A.2d 452 (Pa.Cmwlth. 2000). Moreover, even if it adopts a school board's findings, the CAB has independent judgment to determine whether those findings put forward facts that are sufficiently serious or material to cause revocation of a charter. *Sch. Dist. of City of York v. Lincoln Charter Sch.*, 889 A.2d 1286 (Pa. Cmwlth.2006). The CAB must articulate rational reasons for disagreeing with a school board's decision. Section 1729–A(d) of the CSL, 24 P.S. § 17–1729–A(d).

Before the CAB issued any written decision, the District asked the CAB to reopen the record, and sought reconsideration pursuant to 1 Pa.Code § 35.241.

■ Reconsideration or rehearing motions are only heard after a final adjudication is issued. *See* 1 Pa.Code § 35.226(b) (applications for rehearing are not permitted until an adjudication is issued and becomes a final order). GRAPP defines an "adjudication" as: "[a]n order, decree, decision, determination or ruling by an agency affecting personal or property rights, privileges, immunities, duties, liabil-

ities or obligations of the parties to the proceeding in which the adjudication is made." 1 Pa.Code § 31.3 (definitions); *see also* 2 Pa.C.S. § 101 (definitions). The AAL mandates: "[a]ll adjudications of a Commonwealth agency shall be in writing, shall include findings and the reasons for the adjudication...." 2 Pa.C.S. § 507; *see also* 2 Pa.C.S. § 555 (same, relating to local agencies).

The CAB–1 vote, which was not in writing and did not contain findings, does not qualify as an adjudication. Thus, it was not ripe for reconsideration.[9]

Since the CAB retained jurisdiction, it could consider the petition to reopen. However, any decision to reopen the record is constrained by the CSL and administrative rules regarding supplemental evidence. Therefore, we assess the legal effect of the CAB–1 vote in the absence of a written decision.

### 1. Written Decision Requirement

The CAB–1 voted in September 2011 to reverse the Board's decision on revocation, yet it did not issue a written decision as required by the CSL. Essentially, the Charter School questions the validity of the CAB–2 decision when CAB–1 already took final action at a public meeting. The Charter School challenges the delay in issuing a written decision and the validity of that decision.

In September 2011, the CAB–1 had the authority to act when a majority of its then-members voted in the Charter School's favor. At its public meeting, the CAB–1 stated the District lacked substantial evidence in support of revocation. The

---

9. Even if this Court concluded CAB–1's vote constituted an adjudication, the District did not timely file the application for reconsideration. *See* 1 Pa.Code § 35.241(a) (application must be made within 15 days of adjudication).

Further, the application is deemed denied if the agency does not act upon the request for reconsideration within 30 days. 1 Pa.Code § 35.241(d).

question is whether the CAB–1 vote in September 2011 had any legal effect, other than to place the parties on notice as to the CAB's intended resolution of the matter.

■ We examine the agency's enabling statute to decide whether final action occurs by a public vote, or requires other prerequisites for finality. *Energy Pipeline Co. v. Pa. Pub. Util. Comm'n,* 541 Pa. 252, 662 A.2d 641 (1995). While uncommon, an agency's reversal of its position on the matter before it is not unprecedented. *See, e.g., Energy Pipeline; Keystone Cent. Sch. Dist. v. Sugar Valley Concerned Citizens,* 799 A.2d 209 (Pa.Cmwlth.2002).

*Keystone Central* addresses the legal significance of a vote under the CSL. There, the CAB voted 2–2 on a school's charter application. Initially, the CAB took the position that a tie vote supported affirmance of the school district's decision to deny a charter. However, the CAB later changed its approach and tabled the issue until it could obtain a majority. This Court reasoned there were no provisions precluding the CAB from tabling the issue until it reached a majority decision. *Keystone Central.* The CAB then re-voted, reaching the opposite conclusion, and granted a charter to the applicant. This Court explained the CAB's vote became effective when an order was issued on that vote. *Id.*

In *Energy Pipeline,* three years after issuing a tie vote, on its own motion, the Pennsylvania Public Utility Commission (PUC) re-reviewed a recommended decision and exceptions and re-voted by a majority. The petitioner challenged the delay as unauthorized, and it claimed the PUC had already acted by the tie vote. Our Supreme Court explained the Public Utility Code (Code), 66 Pa.C.S. §§ 101–3316, was the best source for determining the PUC's authority and the legal effect of

the vote. Our Supreme Court reasoned that because Section 301(d) of the Code, 66 Pa.C.S. § 301(d), provided action is taken by a unanimous vote, and a tie vote is not unanimous, the PUC had not acted through the tie vote. As the Code did not require a decision within any specified timeframe, it was not improper for the PUC to re-vote and issue a decision on the re-vote three years after its initial vote.

*Energy Pipeline* teaches that finality of a vote is determined by reviewing the vote in the context of the statutory provisions applicable to an agency's procedures. *Keystone Central* teaches that the CSL requires, at a minimum, a written order effectuating the vote. However, both cases involved tie votes, which were deemed incapable of constituting final action. *Cf. Cmty. Acad. of Phila. Charter Sch.* (CSL provisions requiring additional steps for finalization, not taken, indicated no final action; matter remained pending pursuant to CSL).

Pursuant to Section 1729–A of the CSL, the CAB "shall give due consideration to the findings of the local board of directors and specifically articulate its reasons for agreeing or disagreeing with those findings in its written decision." 24 P.S. § 17–1729–A(d). In addition, if the CAB determines the charter should not be revoked "the [CAB] shall order the local board of directors to rescind its revocation...." 24 P.S. § 17–1729–A(e).

The CAB did not take either of these mandatory actions here. Therefore, the CAB–1 vote did not constitute a final, appealable action under the CSL. The public vote is not self-executing, and requires a decision and order under Section 1729–A of the CSL, 24 P.S. § 17–1729–A. Conspicuously absent from Section 1729–A is a specific timeframe.

The timeframe of 60 days, which the Charter School contends applies, appears in the charter school application provision, Section 1717–A(i)(8) of the CSL, 24 P.S. § 17–1717–A(i)(8). Pursuant to Section 1717–A(i)(8) of the CSL, the CAB must issue a written decision within 60 days following its review of a matter before it. *See Keystone Cent.* (citing *Shenango Valley*). The 60–day time limit is mandatory. *Shenango Valley.* However, it is unclear whether the time limit applies to revocations as well as to applications.

The Charter School contends the CAB must issue a decision within 60 days, regardless of the fact that the time limitation appears only in the charter application section. The Charter School argues Section 1717–A must be read in conjunction with Section 1729–A, as stating a reasonable timeframe for issuing decisions. It relies on *dicta* in this Court's recent decision involving the same parties, citing Section 1717–A as setting the 60–day timeframe for issuing written decisions. *See Shawnee Tabernacle Church v. State Ethics Comm'n,* 76 A.3d 117 (Pa.Cmwlth.2013) (upholding agency's denial of Church's application to intervene before Ethics Commission involving charges against Bloom as a public official).

By its terms, Section 1717–A pertains to "establishment of a charter school," and the "decision made by a local board of directors not to grant a charter as provided in this section." 24 P.S. § 17–1717–A (i)(1). Further, the CAB "shall have exclusive review of an appeal ... by the board of trustees *of an existing charter school,* of a decision made by a local board of directors...." 24 P.S. § 17–1717–A (i)(1) (emphasis added). Additionally, as subsection (i) applies *"in any appeal,"* 24

P.S. § 17–1717–A(i)(6), the provision stating the CAB "shall issue its written decision" within 60 days under Section 1717–A(i)(8), arguably may apply to any appeal, including an appeal from revocation in Section 1729–A of the CSL.

Although Section 1717–A is not expressly limited to charter applicants, it is designed as a self-contained section. In other words, all provisions regarding charter application proceedings are located within it. Similarly, Section 1729–A, which governs revocations, contains revocation-related provisions.

■ If we adopted the Charter School's interpretation (that provisions in Section 1717–A apply to "any appeal," including a revocation appeal), there would be no need for both Section 1717–A *and* Section 1729–A to contain substantially similar language regarding supplementing the record ("previously unavailable"). We do not construe statutes to render their terms "mere surplusage." *Walker v. Eleby,* 577 Pa. 104, 123, 842 A.2d 389, 400 (2004).

■ Based on the structure of the CSL and rules of statutory construction, this Court concludes the CAB is not constrained to issue a written decision on revocation within 60 days. Because the CAB was not required to write a decision within a specific timeframe, its failure to do so did not amount to a denial of due process or a violation of the CSL.[10]

■ While it is troubling that a majority vote may be abandoned for the failure to issue a written decision, lack of written findings and reasons goes to the reviewability of a decision, not its validity. *Madeja v. Whitehall Twp.,* 73 Pa.Cmwlth. 34,

---

10. *Keystone Central* acknowledged a challenge to timeliness of a decision was waived as neither party filed a mandamus action; however, the decision did not discuss who bore the burden to initiate the filing.

457 A.2d 603 (1983). Thus, the CAB–1 action remained valid until rescinded.

## 2. Reopening the Record for Supplemental Evidence

 Because its vote did not constitute an appealable action until it was supported by a written order and decision, the CAB retained jurisdiction. Therefore, the CAB–2 had the discretion to accept supplemental evidence that met the standards of the CSL.

In its request to reopen, the District advised the supplemental evidence would question the financial management of the Charter School for the years 2006 through 2010. Ultimately, in a revised request, the District asked the CAB to accept the Final Audit. The CAB–2 admitted the Final Audit, and permitted additional submissions related to the audit (collectively, Supplemental Evidence).

Both parties submitted such voluminous exhibits that the CAB–2 engaged a hearing officer to address the Supplemental Evidence. Generally, the Supplemental Evidence concerned Bloom's conduct as CEO of the Charter School and related financial improprieties. Many submissions concerned Bloom's relationship to the Charter School after his resignation, and alleged continued financial mismanagement and entanglement with the Church.

 Review of a decision reopening the record is for abuse of discretion. An exercise of that discretion will not be reversed unless clear abuse is shown. *Metro Transp. Co. v. Pa. Pub. Util. Comm'n*, 128 Pa.Cmwlth. 223, 563 A.2d 228 (Pa.Cmwlth. 1989).

The District cites three legal bases for reopening the record: (1) Section 1729–A(d) of the CSL; (2) GRAPP; and, (3) the principle that an agency has discretion to reopen the record to improve the accuracy of its decision.

### a. Previous unavailability

 Under Section 1729–A(d) of the CSL, the CAB has the discretion to reopen the record "if the supplemental information was previously unavailable." 24 P.S. § 17–1729–A(d). The CSL does not set a timeframe for supplementation.

We construe the term "previously unavailable" according to its plain meaning. 1 Pa.C.S. § 1903. "Previously" pertains to timing. In this context, it should be construed to mean the timeframe beginning when the revocation notice was issued, and ending when the record closed. Here, the Board closed the record in June 2010. CAB–1 did not receive additional evidence before voting in September 2011, having denied each party's request to supplement the record. *See* Certified Record (C.R.), Item Nos. 55, 58.

CAB holds "[i]nformation that was previously unavailable cannot include information that could have been obtained and submitted for inclusion into the record prior to the school board's vote, but was not." *See In re: Renaissance Acad. of Pittsburgh, Alternative of Hope Edison Charter Sch.*, Dkt. No. CAB 2001-2 at 4–5; C.R., Item No. 56, at 5.

In context, "unavailable" means not accessible, unknown, or not discernible with due diligence. Thus, to qualify for supplementation, the Supplemental Evidence may not include information that could have been discovered before the record closed in June 2010.

 In determining whether evidence was previously unavailable, courts look to the availability of the facts, not the availability of an opinion pertaining to the facts. *See, e.g., Commonwealth v. Whitney*, 572 Pa. 468, 817 A.2d 473, 478 (2003) (opinion

study published in September 1998 edition of *Cornell Law Review* regarding supposed racial disparity in imposition of death penalty in Philadelphia did not constitute new evidence since statistics used to compile study were public record and so could have been known to defendant before he filed his third relief petition in July 1998); *see also Com. v. Lopez*, 616 Pa. 570, 51 A.3d 195 (2012). That an opinion was previously unwritten does not render the evidence previously unavailable. *Id.* In reference to the current litigation, it is not the availability of the Final Audit that controls; rather, it is the availability of the facts upon which the Final Audit is based.

The District does not explain how the facts in the Final Audit were "previously unavailable." To the contrary, the District explains the importance of the Final Audit as follows: "the significance of the Audit Report was the fact that the Commonwealth's fiscal watchdog was raising similar concerns found within the School Board's Adjudication. [ ... ] In other words, the Auditor General's Report added validity to the findings and conclusions previously made by the School Board." *See* Resp't's Br. at 43 (record citations omitted).

The facts in the Final Audit do not constitute previously unavailable evidence. The facts compiled in the Final Audit are substantially similar to those set forth in the Board adjudication that CAB–1 voted to overturn. Therefore, the facts were available at the time the CAB–1 rendered its first public vote.

Of the six findings in the Final Audit related to the Charter School, only two were not previously litigated: (1) the Charter School may have improperly received $87,101.00 in State lease reimbursements; and, (2) the Charter School lacked a memorandum of understanding with the local police department. The District does not indicate that the facts underlying these findings were unavailable and could not be discerned had the District exercised due diligence.

In addition, the supplemental information "must be relevant and probative to CAB's review. . . ." *In re: Phoenix Charter Sch.*, Dkt. No. CAB 2001–06 at 9. The District acknowledged in its filings to the CAB that the sole issue before the CAB is whether violations of the CSL occurred. C.R., Item No. 56, at 7. The Auditor General cannot determine whether such violations occurred. *See Sch. Dist. of Lancaster v. Office of Auditor Gen.*, 88 Pa. Cmwlth. 300, 489 A.2d 963 (1985).

Further, the CAB has exclusive jurisdiction regarding revocation of a charter under the CSL. Section 1729–A(d) of the CSL, 24 P.S. § 17–1729–A(d). Therefore, the Auditor General's opinions in the Final Audit are not relevant and probative of any CSL violations. This is particularly true where, as here, most of the facts underlying the Final Audit were litigated during the revocation hearings.

Because the Supplemental Evidence did not meet the CSL's standards, the Final Audit and submissions related to its content were not properly considered by the CAB–2 unless supported by other legal authority.

### b. GRAPP

 The District also cites GRAPP as grounds for reopening the record. GRAPP requires that a petition to reopen set forth the changes in fact or law since the closing of the proceeding. Specifically, Section 35.231 of GRAPP provides:

After the conclusion of a hearing in a proceeding or adjournment thereof sine die, a participant in the proceeding may file with the presiding officer, if *before issuance by the presiding officer of a*

*proposed report,* otherwise with the agency head, a petition to reopen the proceeding for the purpose of taking additional evidence. The petition shall set forth clearly the facts claimed to constitute grounds requiring reopening of the proceeding, including *material changes of fact or of law alleged to have occurred since the conclusion of the hearing.*

1 Pa.Code § 35.231 [11] (emphasis added).

Similar to the standard under the CSL, to serve as a basis to reopen the record, "the material changes of fact *must not have been discoverable prior to the conclusion of the hearing.*" *Shoemaker v. State Emps.' Ret. Bd.* 688 A.2d 751, 752 (Pa. Cmwlth.1997) (emphasis added). The facts in the Final Audit do not meet these prerequisites.

In addition to seeking to add facts which were previously undiscoverable, a motion to reopen the record is subject to time limitations. In particular, such a motion should be filed *before* any recommendation is made. Here, the CAB voted in the Charter School's favor prior to receiving the instant petition to reopen the record. This raises an issue as to whether the District's application to reopen met GRAPP's timing requirements.

Because the District did not establish the prerequisites for reopening an administrative proceeding under GRAPP, we consider the District's last legal basis for reopening the record.

### c. Better adjudication

■ The District relies upon *Al Hamilton* to support reopening the record to accept the Final Audit. Specifically, it re-

lies on language that reopening of a record is appropriate "in the interest of a more accurate adjudication." *Al Hamilton,* 659 A.2d at 36.

In *Al Hamilton,* the petitioner challenged the Environmental Hearing Board's (EHB) decision to admit evidence during the course of administrative hearings, before the record closed. The Department of Environmental Resources (DER) sought to reopen the record in order to introduce records relied upon by its expert. DER did not admit them when it presented its case in chief through inadvertence. At the time, although DER had closed its case, the record was not closed and no adjudication had issued.

This case is distinguishable from *Al Hamilton* in material respects. First, the timing of the request in *Al Hamilton* precluded application of GRAPP's rules for reopening the record, which only apply *after* the record is closed. As GRAPP did not govern, this Court considered the necessity for the evidence, and deemed it beneficial to reach an accurate result. Second, *Al Hamilton* is inapposite because in that case the party sought to introduce new evidence *before* the adjudicator closed the record and before the other party put on its case. This afforded a full opportunity to refute the new evidence during the main hearing. Third, in *Al Hamilton,* the evidence was not admitted initially due to inadvertence. The District makes no such claim here.

■ Our Supreme Court states that a case may be reopened where it is in the interest of a more accurate adjudication or where an honest purpose would be justly

---

11. Although the District also cites 1 Pa.Code § 35.233, it does not apply to these facts, since the CAB did not act on its own initiative. Section 35.233 also provides the record may only be supplemented when *"conditions*

*of fact or law have so changed as to require, or that the public interest requires, the reopening of the proceeding."* 1 Pa.Code § 35.233 (emphasis added).

served without unfair disadvantage. *In re J.E.F.*, 487 Pa. 455, 409 A.2d 1165 (1979). However, the principle from *Al Hamilton*, when quoted in its entirety, applies only "any time up to the conclusion of the hearing." 659 A.2d at 35. Since the hearings before the Board were already concluded at the time reopening was sought here, this principle does not apply to the current case.

Moreover, there is no indication in the CAB's adjudication that the Final Audit was necessary for an accurate adjudication. In fact, in its written decision, CAB-2 does not articulate why it reversed itself.

In sum, the District failed to establish any of its three legal bases for reopening the record; accordingly, the CAB did not have the authority to do so. That the CAB permitted each party to submit additional information did not overcome the CAB's lack of authority to accept supplemental evidence that does not meet administrative standards.

The CAB-2 decision to admit the Final Audit constituted a clear abuse of discretion. The Final Audit and related information should have been excluded because the information did not qualify as previously unavailable, and it was offered after the close of the hearing record and after the CAB-1 already voted.

In light of the CAB's abuse of discretion in accepting additional evidence, it is unnecessary to address the Charter School's substantive argument on the merits [12] that the CAB's order is not supported by substantial evidence.

Nevertheless, we note the Final Audit was not admissible evidence. Rather, the Final Audit is hearsay, offered for the truth of the matter asserted. *Com. v. Busanet*, 618 Pa. 1, 55–56, 54 A.3d 35, 68 (2012). Once the Charter School objected to the Final Audit's admission, the CAB-2 should have required attendance of its authors. *Kreiger v. City of Phila., Bd. of Pensions & Ret.*, 47 Pa.Cmwlth. 131, 408 A.2d 170 (1979). Therefore, the Final Audit was not a proper basis for the CAB-2's decision.

Notably, the CAB-2 written decision differentiates between findings made based on the record created before the Board and the findings based on the Supplemental Evidence. Of the 141 findings, the CAB-2 made 89 findings based on the record before the Board and the CAB-1, which appear supported by some properly received and admissible evidence.

However, it cannot be determined how the CAB-2 weighed the evidence. In each section of its analysis on the substantive charges, the CAB-2 refers to parts of the Supplemental Evidence. *See, e.g.,* CAB-2 Op. at 22 (referring to Finding No. 1 in the Final Audit); CAB-2 Op. at 28 (referring to March 2012 affidavit about expenditures for audio equipment). Therefore, the CAB-2 revocation decision appears at least influenced by the Supplemental Evidence.

Although the CAB-1 determined the evidence before the Board was insufficient to establish revocation, the CAB-2 reached the opposite conclusion after admitting the Supplemental Evidence. Significantly, this discrepancy is not explained in the CAB-2 rationale. This situation substantially interferes with meaningful judicial

---

12. The Charter School also challenged the constraints the CAB stated in its appointment letter to the hearing officer that limited cross-examination and rebuttal to the Final Audit. Because we hold the CAB erred in accepting Supplemental Evidence, and the hearing officer's role was limited to addressing evidence that should not have been accepted, this argument is moot.

review, and necessitates further explanation on a proper record.

## IV. Conclusion [13]

The CAB–2 erred in reopening the record and accepting the Final Audit. In its written decision, the CAB–2 apparently relied on the Final Audit and the Supplemental Evidence related to it. The timing of reopening the record, after the CAB–1 rendered a majority vote and noted deficiencies in the record evidence, is problematic. Against this backdrop, the District used reopening of the record to re-litigate issues it lost before the CAB–1.

Ultimately, the CAB may decide to revoke the Charter School's charter based upon the evidence that is properly of record from the 16 hearings before the Board. However, this Court is not in a position to discern that from the CAB–2 written decision.

Particularly because the record reveals procedural irregularities, the CAB should be afforded the opportunity to correct them on remand. Therefore, we vacate and remand so the CAB may promptly decide the appeal based on evidence of facts that occurred during the relevant timeframe under review, comprised of the record before the Board. The CAB shall give this matter priority and shall issue an adjudication on remand no later than the end of the current school year.

### ORDER

AND NOW, this 26th day of February, 2014, the August 2, 2013 order of the State Charter School Appeal Board is **VACATED,** and the case is **REMANDED** to the

State Charter School Appeal Board, for action before the end of the current school year, in accordance with the foregoing opinion.

---

**13.** The Charter School waived its arguments that Acting Secretary William Harner was not authorized to call or preside over the meeting where the CAB–2 voted, and lacked authority to sign the CAB–2's order because he was not confirmed by the State Senate. *Cohen v.* *State Bd. of Med.,* 676 A.2d 1277, 1280 n. 9 (Pa.Cmwlth.1996) (arguments not preserved in petition for review are waived). The Charter School concedes in its reply brief that it did not specify this reason for objecting to the CAB proceedings. *See* Pet'r's Reply Br. at 10.