Reading School District,      :
              Petitioner      :
                              :
         v.                 :
                              :
I-Lead Charter School,      :      No. 78 C.D. 2018
              Respondent      :      Argued: November 15, 2018


BEFORE:     HONORABLE RENÉE COHN JUBELIRER, Judge
                HONORABLE ANNE E. COVEY, Judge (P.)
                HONORABLE CHRISTINE FIZZANO CANNON, Judge

OPINION BY
JUDGE COVEY                           FILED: March 14, 2019


Reading School District (District) petitions this Court for review of the Pennsylvania State Charter School Appeal Board's (CAB) December 20, 2017 order granting I-Lead Charter School's (I-Lead) appeal from the District's decision revoking I-Lead's charter, and directing the District to sign the charter. The District presents the following issues for this Court's review: (1) whether CAB arbitrarily and capriciously disregarded record evidence; (2) whether CAB's decision is erroneous because it is contrary to law, is not supported by substantial evidence, and disregards I-Lead's failure to comply with the academic performance requirements in the State Board of Education's Regulations and academic goals set forth in I-Lead's charter application; (3) whether CAB committed an error of law by concluding that it cannot decide if I-Lead violated the Sunshine Act;[1] (4) whether CAB erred when it concluded that I-Lead did not violate the Public Official and Employee Ethics Act[2] (Ethics Act); and (5) whether CAB's decision regarding I-Lead's compliance with

---

[1] 65 Pa.C.S. §§ 701-716.
[2] 65 Pa.C.S. §§ 1101-1113.

highly-qualified teacher[3] requirements (HQT) was erroneous. After review, we vacate and remand.

## I. BACKGROUND

The District operates Reading Senior High School (RSHS), which serves approximately 3,500 students in grades 10 through 12. I-Lead, Inc. is a Pennsylvania nonprofit corporation.[4] I-Lead is a charter school that was established in the District in 2010 and which operates pursuant to the Charter School Law (CSL).[5] I-Lead is the only charter school within the District's boundaries. I-Lead's mission is as follows:

> [I-Lead] empowers youth age 17 and up who have dropped out of school and appear on the off-roll list to be self-sufficient members of the 21st Century economy as effective leaders, creative entrepreneurs, and engaged citizens. At [I-Lead], leadership, citizenship, academics, and work experience are integrated, and responsibility for learning and leading is shared among the youth, the staff, families, and the community.

Reproduced Record (R.R.) at 319a. I-Lead's target students include individuals 17 to 21 who are not attending school, students who are enrolled but truant, enrolled students at risk of dropping out, and individuals experiencing hardships and challenges such as, *inter alia*, court adjudications, addiction, homelessness, abuse and pregnancy. *See* R.R. at 707a.

---

[3] "In Pennsylvania, a highly[-]qualified teacher . . . is one who: (i) holds a [Pennsylvania Department of Education]-issued teaching certificate in a core content area; and (ii) demonstrates subject matter competency within that core content area[]." CAB Op. at 11, Finding of Fact No. 38.

[4] *See* Section 501(c)(3) of the Internal Revenue Code, 26 U.S.C.S. § 501(c)(3). I-Lead, Inc.'s Executive Director, President and CEO David Castro testified that I-Lead, Inc.'s "mission is to improve quality of life in challenged communities through leadership[,] development and education." Reproduced Record at 678a. I-Lead, Inc. was the charter school applicant and has provided financial support for I-Lead.

[5] Act of March 10, 1949, P.L. 30, *as amended*, added by Section 1 of the Act of June 19, 1997, P.L. 225, 24 P.S. §§ 17-1701-A - 17-1751-A.

On October 27, 2010, the District approved Resolution Gen-55 which granted I-Lead's charter application (Charter Application)[6] for a 3-year term, but directed I-Lead to provide classes for students in grades 9 through 12. I-Lead and the District executed a charter agreement (Charter Agreement) which imposed specific responsibilities upon I-Lead, including: complying with the CSL, complying with secondary education curriculum requirements, and "observ[ing] the provisions of the [Charter Application.]" R.R. at 331a. The Charter Agreement further mandated that "[I-Lead] will provide education for grades 9 through 12 but will give preference in enrollment to [dropout] students consistent with its [Charter A]pplication." R.R. at 331a.

In October 2013, the District renewed I-Lead's charter for a 5-year term (July 1, 2014 through June 30, 2019). Although a new charter agreement was not proposed following the October 2013 renewal vote, approximately 10 months later, by August 8, 2014 letter, the District proposed a new charter agreement.

On June 5, 2015, the District's counsel Allison S. Petersen (Petersen) sent a letter to I-Lead's counsel, Robert W. O'Donnell (O'Donnell), threatening to "move forward with [charter] revocation proceedings" based on numerous concerns with I-Lead's operation. R.R. at 305a. Petersen described I-Lead's students' academic performance as "deficient and not in accordance with the intent of the [CSL]." R.R. at 304a. Petersen also expressed concern with I-Lead's failure to take "steps to ensure that all of [I-Lead's] teaching staff are highly qualified as required under federal law." *Id*. Based on I-Lead's bylaws, board meeting minutes and other documents, Petersen further accused that I-Lead was "not operating in accordance with the [CSL], the Sunshine Act, the Ethics Act or [I-Lead's] own bylaws." R.R. at

---

[6] The Charter Application is referenced in numerous documents in the Reproduced Record as the "Revised Charter Application" because I-Lead, Inc. had previously submitted a Charter Application which was denied. However, we exclusively refer to it as the "Charter Application" herein.

305a. Petersen voiced concerns with I-Lead, Inc.'s involvement in I-Lead's management, and the sharing of common board members between the two entities. Petersen also expressed that I-Lead's board members' statements of financial interest were incomplete and some members had failed to file them at all.

Based thereon, Petersen explained that the District was preparing a resolution to present at its June 25, 2015 meeting to revoke I-Lead's charter. Notwithstanding, Petersen proposed:

> To avoid the time and expense of revocation proceedings, the [] District is willing to make one more attempt to reach a resolution on [the implementation of accountability] standards. **If [I-Lead] agrees to** [certain enumerated] **accountability terms and conditions** as part of a renewal charter acceptable to the [] District, the term of which would be from the 2014-[20]15 school year through the 2018-2019 school year ('Renewal Term'), **the [] District would agree to forego revocation at this time and continue to monitor the performance and operations of [I-Lead] during the Renewal Term.**

R.R. at 305a-306a (emphasis added). On June 15, 2015, O'Donnell responded, in relevant part:

> Please be advised that there is no management contract or other financial agreement between [I-Lead and I-Lead, Inc.[7]] The role of I[-]Lead[,] Inc. has purely been that of a

---

[7] In its brief to this Court , I-Lead represents:

> I-L[ead,] Inc. is the sponsoring organization of [I-Lead] in that it was the applicant for the charter school and has philanthropically supported [I-Lead] since its inception. I-L[ead,] Inc. is neither a management company nor a vendor to [I-Lead], and has not performed any work for any other charter school in the state. I-L[ead,] Inc. staff members have donated time and money to support [I-Lead].

> [The District] approved the [Charter Application] which placed I-L[ead,] Inc. in a supportive role. The [Charter] Application provided that I-L[ead,] Inc.'s Board of Directors would form the Board of Trustees for [I-Lead].

4

donor. I[-]Lead[,] Inc. has funded [I-Lead] in a variety of ways and has never realized any gain nor was any gain intended. For example, the lease which your client already has provides that there is **effectively no rent** charged by I[-]Lead[,] Inc. The only payment is for operating expenses.

The only 'money changing hands' that you refer to is the advancement of funds by I[-]Lead[,] Inc. to [I-Lead] to meet cash flow needs. These funds are lent **without interest**. There is simply no basis for the sinister implications in your letter.

As far as academic performance is concerned, as you are well aware, the priority for enrollment at [I-Lead] is drop[]out status. These students start from well behind the conventional enrollee and to impose unrealistic performance standards creates inevitable conflict later on.

Your letter unequivocally threatens revocation proceedings which my client believes unnecessarily creates more conflict and expense and undermines their [sic] efforts to serve their [sic] students. Therefore, [I-Lead] is prepared, albeit under duress, to sign the charter agreement as proposed in your letter.

R.R. at 263a (underline emphasis added).

On September 21, 2015, I-Lead submitted a request to amend its charter (Amendment Request) to "clarify the terms of its charter[.]"[8] R.R. at 238a. On September 23, 2015, (just two days after I-Lead submitted its Amendment Request, only three months after the District proposed to "forego revocation" and I-Lead accepted the District's proposed terms, and just two years after the District renewed I-

_____

I-Lead Br. at 18.

[8] I-Lead sought in the Amendment Request,

> among other things . . . : (1) to replace the academic goals within the existing [C]harter [Agreement] with new ones; (2) to clarify the independence of I-Lead, Inc. . . . from I-Lead; and (3) to specify that I-Lead shall comply with the Sunshine Act . . . and [HQT] requirements, and offer compliance training regarding the Sunshine Act and the Ethics Act.

CAB Op. at 1.

5

Lead's charter), the District's Board of School Directors (District's Board) approved a resolution initiating revocation proceedings against I-Lead. R.R. at 306a. The resolution referenced as grounds for revocation the same concerns raised in Petersen's June 5, 2015 letter. Specifically, the District's Board specified in Charge 1 that I-Lead "[f]ail[ed] to meet the requirements for student performance set forth in [Chapter 5 of State Board of Education's Regulations,] 22 P[a.] Code Ch. 5 (relating to curriculum) or subsequent regulations promulgated to replace 22 P[a.] Code Ch. 5, or fail[ed] to meet any performance standards set forth in the written charter." R.R. at 311a. The District's Board averred in Charge 2 that I-Lead "[v]iolat[ed] [] provisions of the [CSL] and/or any provisions of law which the charter school has not been exempted, including federal laws and regulations governing children with disabilities." R.R. at 312a. The District's Board alleged in Charge 3 that I-Lead "[f]ail[ed] to meet generally[-]accepted standards of fiscal management or audit requirements." R.R. at 313a.

The District's Board appointed a hearing examiner who held hearings on both the Amendment Request and the revocation proceedings on January 21 and 22, 2016 and February 2, 5, 8 and 9, 2016. During a 30-day public comment period which followed the hearings, 987 written communications were submitted **supporting** I-Lead.[9]

On May 18, 2016, the District granted in part and denied in part the Amendment Request. On May 25, 2016, the District's Board voted to revoke I-Lead's charter based on Charges 1 and 2. On June 23, 2016, I-Lead filed with CAB a petition appealing the charter revocation.[10] On September 16, 2016, pursuant to

---

[9] *See* CAB Op. at 6. These included letters from a State Representative, a State Senator, a County Commissioner, members of the Reading City Council, and parents of I-Lead's students.

[10] On June 16, 2016, I-Lead filed with CAB a petition appealing from the partial denial of the Amendment Request. I-Lead later withdrew that petition and, thus, the District's Amendment Request decision is not before this Court.

6

Section 1729-A(d) of the CSL,[11] I-Lead filed a motion to supplement the record (I-Lead Motion) with the following documents: (1) minutes and attachments from I-Lead's Board of Trustees' 2016 public meetings; (2) August and September 2016 letters of support from public officials; (3) 2016 statements of financial interest filed by I-Lead board members and administrators; and (4) I-Lead Board of Trustees' meeting minutes from January and March 2014. I-Lead also requested a hearing at which former I-Lead Board chair and Executive Director, President and CEO of I-Lead, Inc. David Castro (Castro) would testify regarding the independent committee that negotiated the lease for I-Lead's building and the discussions held at public meetings pertaining to those lease transactions. On November 21, 2016, the District filed a motion to supplement the record *nunc pro tunc* (District Motion) with I-Lead's and the District's 2015-2016 Specific Performance Profile (SPP)[12] scores released by the Pennsylvania Department of Education (PDE) on October 27, 2016.

---

[11] Section 1729-A(d) of the CSL provides, in relevant part: "[CAB] shall review the record and shall have the discretion to supplement the record if the supplemental information was previously unavailable." 24 P.S. § 17-1729-A(d).

[12] Prior to the 2012-2013 school year, "[t]he Pennsylvania Department of Education (PDE) set . . . Adequate Yearly Progress (AYP) standards under the No Child Left Behind Act[,]" 20 U.S.C. §§ 6301–7941, based on the Pennsylvania System of School Assessment (PSSA). *New Hope Acad. Charter Sch. v. Sch. Dist. of the City of York*, 89 A.3d 731, 733-34 (Pa. Cmwlth. 2014). "Even if a school [did] not satisfy those AYP proficiency thresholds, AYP [could] also be achieved through other safe harbor and growth methods based on reductions in the percentage of non-proficient students and improvements in scores toward proficiency." *Id*. at 734.

> In the 2012-2013 school year, [the] PDE created a new metric for measuring academic achievement, the SPP and Federal Designation system, which was approved by the [United States Department of Education] and replaced AYP in Pennsylvania. The SPP is a system that incorporates various data points including raw test scores on the PSSA and Keystone Exams (as applicable), [Pennsylvania Value-Added Assessment System (]PVAAS[)] scores as well as a host of other measurable factors such as graduation rates and Advanced Placement Test scoring. The system generates a SPP Building Level score on a 1-100 scale with certain scoring intervals being tiered into classifications. However, the information that is analyzed to create

7

On January 3, 2017, CAB's hearing examiner denied I-Lead's Motion because its documents were not relevant and/or were not previously unavailable, and granted the District's Motion because the SPP data was relevant and previously unavailable. Subsequently, I-Lead submitted, and the hearing examiner granted, a motion to supplement the record with Citadel Intermediate High School's (Citadel)[13] 2016 SPP scores released by the PDE on October 27, 2016.

On June 13, 2017, CAB granted I-Lead's appeal from the District's charter revocation. CAB explained its rationale for supplementing the evidence as follows:

> The 2015-2016 SPP [scores] of I-L[ead] and the [District], which were released by PDE on October 27, 2016, were **previously unavailable and are directly relevant to the issue of I-L[ead]'s academic performance.** CAB has considered SPP data in its revocation and nonrenewal cases since the SPP system took effect in Pennsylvania.

CAB Op. at 24 (citations omitted; emphasis added).[14]

---

> the Building Level score such as the academic achievement data of students in Reading and Math is also reported.

*Imani Educ. Circle Charter Sch. v. Sch. Dist. of Phila.*, (Dkt. No. CAB 2014-08, filed May 11, 2016), at 33-34 (footnote omitted).

[13] Citadel is located in the District and serves students in grades 8 and 9.

[14] "We construe the term 'previously unavailable' according to its plain meaning. 1 Pa.C.S. § 1903. 'Previously' pertains to timing. In this context, it should be construed to mean the timeframe beginning when the revocation notice was issued, and ending when the record closed." *Pocono Mountain Charter Sch., Inc. v. Pocono Mountain Sch. Dist.*, 88 A.3d 275, 291 (Pa. Cmwlth. 2014). Further,

> CAB holds '[i]nformation that was previously unavailable cannot include information that could have been obtained and submitted for inclusion into the record prior to the school board's vote, but was not.' *See In re: Renaissance Acad. of Pittsburgh, Alternative of Hope Edison Charter Sch.*, [(]Dkt. No. CAB 2001-2[, filed October 16, 2001)] at 4-5; C.R., Item No. 56, at 5.

> In context, 'unavailable' means not accessible, unknown, or not discernible with due diligence.

On the merits, CAB held that I-Lead's students had demonstrated significant improvement and accordingly, I-Lead had satisfied the CSL's performance requirements. CAB also ruled that I-Lead's failure to meet HQT requirements was not alone sufficient to deny I-Lead's charter. In addition, CAB noted that I-Lead acknowledged its Sunshine Act violations and the record showed improvement with its compliance, but concluded that CAB did "not [] have jurisdiction over open meeting challenges for local agencies." CAB Op. at 29. Thus, CAB "[could not] consider these alleged Sunshine [Act] violations in determining whether or not I-L[ead]'s charter should be revoked." *Id*. at 30. CAB further determined that I-Lead's alleged Ethics Act violations did not warrant charter revocation because although there was commingling between I-Lead and I-Lead, Inc., there was no evidence that anyone was enriched by it.[15] CAB explained that although it does not have jurisdiction to hear Ethics Act violations, it "can take into consideration [lack of compliance] in determining governance issues," and rejected the District's argument that I-Lead's Board members' failure to file financial disclosure statements should be attributed to I-Lead. *Id*. at 34. The District timely appealed to this Court.[16]

---

*Id*.

[15] CAB characterized the relationship between I-Lead and I-Lead, Inc. as follows: "(1) philanthropy, including zero percent interest loans, contributions, and a below-market lease for real estate; and (2) provisions that the Board of Directors for I-L[ead], Inc. will be the Board of Trustees for I-Lead." CAB Op. at 33.

[16] "Our review of [CAB's] decision is limited to determining whether constitutional rights were violated, whether errors of law were committed or whether the decision is not supported by substantial evidence." *New Hope Acad.*, 89 A.3d at 736.

## II. DISCUSSION

Initially,

[t]he core purpose of the [CSL] is to improve students' education. The General Assembly expressly set forth its intention in enacting the [CSL] to '[i]mprove pupil learning,' '[i]ncrease learning opportunities for all pupils,' and '[h]old the schools established under [the CSL] accountable for meeting measurable academic standards and provide the school with a method to establish accountability systems.' [Section 1702-A (1), (2), (6) of the CSL,] 24 P.S. § 17-1702-A(1), (2), (6)[.]

*New Hope Acad. Charter Sch. v. Sch. Dist. of the City of York*, 89 A.3d 731, 739 (Pa. Cmwlth. 2014) (citations omitted).

Section 1729-A(a) of the CSL permits a local board of school directors to revoke a charter or deny renewal based on any of the following:

(1) One or more material violations of any of the conditions, standards or procedures contained in the written charter . . . .

(2) Failure to meet the requirements for student performance set forth in [Chapter 5 of the State Board of Education's Regulations,] 22 Pa. Code Ch. 5 (relating to curriculum) or subsequent regulations promulgated to replace [Chapter 5 of the State Board of Education's Regulations] or failure to meet any performance standard set forth in the written charter signed pursuant to [S]ection 1716-A [of the CSL].

(3) Failure to meet generally[-]accepted standards of fiscal management or audit requirements.

(4) Violation of provisions of [the CSL].

(5) Violation of any provision of law from which the charter school has not been exempted, including [f]ederal laws and regulations governing children with disabilities.

(6) The charter school has been convicted of fraud.

24 P.S. § 17-1729-A(a).

10

Section 1729-A(d) of the CSL provides for CAB's review of a school board's charter revocation or nonrenewal decision.[17] *See* 24 P.S. § 17-1729-A(d). In *West Chester Area School District v. Collegium Charter School*, 812 A.2d 1172 (Pa. 2002), the Pennsylvania Supreme Court held that CAB applies a *de novo* standard of review from a school board's denial of a charter school application, stating, "such review requires [] CAB to give 'appropriate consideration' to the findings of the [d]istrict [b]oard, while making an independent determination as to the merits . . . ." *Id*. at 1180. The Court explicitly rejected the argument that "*de novo* review would result in [] CAB giving *no consideration* to the [d]istrict [b]oard's findings, a result inconsistent with the statutory discretion granted to local school boards."[18] *Id.* at 1179. Thus, CAB "exercise[s] the authority to arrive at an **independent judgment** on the matter in dispute." *Id*. at 1178 n.9 (emphasis added) (quoting *Codorus Stone & Supply Co., Inc., v. Kingston*, 711 A.2d 563, 566 (Pa. Cmwlth. 1998)).

Section 1729-A(d) of the CSL governs CAB's exercise of its independent judgment:

---

[17] The statutory criteria for charter nonrenewal and revocation are the same. *See* 24 P.S. § 17-1729-A(a); *Discovery Charter Sch. v. Sch. Dist. of Phila.*, 166 A.3d 304 (Pa. 2017).

[18] In contrasting CAB's standard of review with the appellate standard of review, the Court explained: "The plain language of the CSL directs [] CAB to specifically articulate its reasons for 'agreeing or disagreeing' with the [d]istrict [b]oard's findings. Simply stated, substantial evidence review does not involve agreement or disagreement with findings." *W. Chester*, 812 A.2d at 1179-80. This Court has also recognized:

> Because a school district has a financial interest in the outcome of a charter grant or denial, 'the minimum requirements of due process require that the charter school applicant have a neutral fact finder in [CAB].' [*W. Chester*, 812 A.2d at 1181]. [CAB] 'must apply a *de novo* standard of review when entertaining appeals from a [d]istrict [b]oard's denial of a charter school application.' *Id.* at 1180.

*Sch. Dist. of Pittsburgh v. Provident Charter Sch. for Children with Dyslexia*, 134 A.3d 128, 139 n.24 (Pa. Cmwlth. 2016).

> [CAB] may consider the charter school plan, annual reports, student performance and employe and community support for the charter school in addition to the record. [CAB] shall give due consideration to the findings of the local board of directors and specifically articulate its reasons for agreeing or disagreeing with those findings in its written decision[.]

24 P.S. § 17-1729-A(d).

Based on the above foundation, this Court addresses the District's arguments.

### A. Disregard of Evidence

The District first contends that CAB arbitrarily ignored record evidence demonstrating that revocation was proper based on student performance. It contends that, despite having found that the 2015-2016 SPP scores were "directly relevant to the issue of I-L[ead]'s academic performance[,]" CAB erroneously failed to consider that evidence because "[t]he most recent data available to the [District] at the time of the adoption of the Revocation Adjudication in May of 2016 was for the 2014-[20]15 School Year[.]" CAB Op. at 24, 26.

In an appeal to CAB from a school district's decision denying renewal or revoking a charter, Section 1729-A(d) of the CSL grants CAB discretion to supplement the record if the supplemental information was "**previously unavailable**." 24 P.S. § 17-1729-A(d) (emphasis added). Based on its clear language, Section 1729-A(d) of the CSL **specifically contemplates** that, on appeal, CAB may consider information that did not inform a school district's decision.[19] This statement is consistent with CAB's *de novo* review function, "making an

---

[19] Notably, prior CAB decisions have relied upon student performance data occurring after a school district resolved to revoke a charter. *See, e.g., Imani Educ. Circle Charter Sch.; Cmty. Acad. of Phila. Charter Sch. v. Sch. Dist. of Phila., Sch. Reform Comm'n*, (Dkt. No. CAB 2013-12, filed September 8, 2014).

independent determination as to the merits . . . ." *W. Chester*, 812 A.2d at 1180.[20]  In its opinion, CAB explained:

> The most recent data available to the School District at the time of the adoption of the Revocation Adjudication in May of 2016 was for the 2014-[20]15 School Year, when I-L[ead] had an SPP score of 40.0, an increase of nearly 20% over the 2013-[20]14 School Year.  []CAB rejects the over-simplified comparisons between the student performance on Keystone Exams at I-L[ead] and RSHS as reported in SPP documentation given I-L[ead]'s focus and mission to educate at-risk students.  Further, the record here supports a conclusion that I-L[ead] has made substantial improvements in academic performance.

CAB Op. at 26.  Nowhere in CAB's opinion does CAB discuss and substantively consider I-Lead's student performance for the 2015-2016 school year, and the **significant drop** in student performance in all academic areas during that period, as referenced, *infra*.[21]  CAB referenced and discussed student performance for all

---

[20] *See, e.g., Leatherwood, Inc. v. Dep't of Envtl. Prot.*, 819 A.2d 604 (Pa. Cmwlth. 2003).

[21] The Dissent claims:

> [N]othing in CAB's decision suggests to me that it disregarded any particular test score or data set in making that decision.  Instead, CAB noted that it had considered all of the evidence before it, **including the supplemental evidence** claimed to have been disregarded by the Majority, and was satisfied that, 'given I-L[ead]'s focus and mission to educate at-risk students,' I-Lead had made 'improvement in student performance in the last several school years.'  (CAB Op. at 26, 34; Conclusion of Law ¶ 14.)  That CAB did not directly cite the statistics from the 2015-2016 School Year in its opinion does not mean CAB disregarded that evidence.  Rather, CAB's decision reflects, and the record supports, that 'I-L[ead]'s students have shown improvement.' (CAB Op. at 28.)

Dissenting Op. at 3-4.  However, in Findings of Fact Nos. 30 through 33, CAB describes SPP scores for each school year up to and including the 2014-2015 school year.  CAB does not address the SPP score for the 2015-2016 school year.  Instead, the very next Finding of Fact states that "[t]he most recent data available to the [District] at the time of the adoption of the Revocation Adjudication in May of 2016 was that for the 2014-[20]15 School Year, I-L[ead] had an SPP score of 40.0 [from the prior year's SPP score of 33.5], an increase of nearly 20% over the 2013-[20]14 School Year."  CAB Op. at 10, Finding of Fact No. 34.  CAB's omission of I-Lead's 2015-2016

academic years **other** than the 2015-2016 school year and made conclusions directly contrary to the 2015-2016 data without reconciling or even acknowledging the conflict.

"[O]ur case law defines a capricious disregard of the evidence to exist 'when there is a **willful and deliberate disregard of competent testimony and relevant evidence** which one of ordinary intelligence could not possibly have avoided in reaching a result.'" *Pocono Manor Inv'rs, LP v. Pa. Gaming Control Bd.*, 927 A.2d 209, 216 (Pa. 2007) (emphasis added) (quoting *Arena v. Packaging Sys. Corp.*, 507 A.2d 18, 20 (Pa. 1986)). CAB specifically supplemented the record with the 2015-2016 SPP data, finding that information "**directly relevant to the issue of I-L[ead]'s academic performance.**" CAB Op. at 24 (emphasis added). Despite having found the information **relevant, previously unavailable**, and properly admitted,[22] CAB erred when it "deliberate[ly] disregard[ed] . . . relevant evidence" by failing to consider the 2015-2016 SPP data in deciding whether to revoke I-Lead's charter. *Pocono Manor*, 927 A.2d at 216.

**B. CAB's Application of Proper Standards**

---

School Year SPP avoids an inconvenient discussion of the 2015-2016 SPP score decrease from 40 to 32.5, a drop which **exceeded** the prior year's increase.

CAB's failure to consider student performance for the 2015-2016 school year is further evidenced by its conclusion that "[n]o students have been enrolled in I-L[ead] over a five-year timeframe and therefore it is not possible to make an accurate judgment about the ability of I-L[ead] to retain students in school." CAB Op. at 27 (emphasis added). I-Lead enrolled students over a five-year period between 2011 and 2016: I-Lead's first year operating was 2011-2012; its second year was 2012-2013; its third year was 2013-2014; its fourth year was 2014-2015; and **its fifth year was 2015-2016.** Thus, it is clear that CAB did not consider the 2015-2016 school year student performance. CAB's general statement in the Conclusion to its Opinion that "review[ed] the record below, as well as the supplemental information admitted to the record," does not convince this Court that it considered and weighed the supplemental information as it pertains to student performance. CAB Op. at 34.

[22] Notably, I-Lead does not argue in its brief to this Court that CAB erred when it found the 2015-2016 SPP data relevant, and supplemented the record with that evidence.

The District next argues that CAB failed to apply the law in *New Hope Academy* to evaluate whether there existed valid grounds to revoke I-Lead's charter based on I-Lead's full history of SPP scores and proficiency data, dropout and graduation rates, and its compliance history with respect to the goals described in its Charter Application.

**1. Academic Performance Standards**

The District contends that *New Hope Academy* **mandates** charter revocation where, as here, I-Lead's proficiency rates were significantly below those of the District's other schools, and where there was no pattern of significant improvement. It maintains that such lack of improvement would have been evident had CAB properly considered SPP scores and academic proficiency percentages for the 2015-2016 school year.

In *New Hope Academy*, this Court explained that "Section 1729-A(a)(2) of the [CSL] **permits** a school district to deny renewal of a charter school's charter for failure to meet student academic performance standards. 24 P.S. § 17-1729-A(a)(2)[.]" *New Hope Acad.*, 89 A.3d at 736 (emphasis added). Further,

> [Chapter 4[23]] sets forth the [Pennsylvania System of School Assessment ([)PSSA[)[24]] as the measure of student and

---

[23]     Chapter 5 of Title 22 of the Pennsylvania Code, to which Section 1729-A(a)(2) [of the CSL] refers, has been repealed and replaced by [Chapter 4 of the State Board of Education's Regulations (Chapter 4),] 22 Pa. Code Chapter 4. 29 Pa. B. 399 (1999) [(relating to Academic Standards and Assessment)]. The regulations referenced in Section 1729-A(a)(2) [of the CSL] are therefore those set forth in [Chapter 4].

*New Hope Acad.*, 89 A.3d at 737.

[24] On its website, PDE explains:

> The annual [PSSA] is a standards-based, criterion-referenced assessment which provides students, parents, educators and citizens with an understanding of student and school performance related to the attainment of proficiency of the academic standards. These

school performance and sets standards of performance to be measured by the PSSA, including proficiency.

*New Hope Acad.*, 89 A.3d at 737.

Section 4.51(b) of Chapter 4 provides that "[t]he [s]tate assessment system must include PSSA assessments and Keystone[25] Exams." 22 Pa. Code § 4.51(b).

Proficiency as measured by PSSA test scores is therefore a Chapter 4 student performance requirement. **A consistently**

---

standards in English Language Arts, Mathematics, and Science and Technology identify what a student should know and be able to do at varying grade levels. School districts possess the freedom to design curriculum and instruction to ensure that students meet or exceed the standards' expectations.

Every Pennsylvania student in grades 3 through 8 is assessed in English Language Arts and Math. Every Pennsylvania student in grades 4 and 8 is assessed in [S]cience.

https://www.education.pa.gov/K-12/Assessment%20and%20Accountability/PSSA/Pages/default.aspx (last visited 3/6/19). Prior to the 2012-2013 school year, 11th grade students were also required to take PSSA tests. The Keystone Exam (further described, *infra*), replaced the 11th grade PSSA tests.

[25] According to PDE's website:

The Keystone Exams are end-of-course assessments designed to assess proficiency in the subject areas of Algebra I, Algebra II, Geometry, Literature, English Composition, Biology, Chemistry, U.S. History, World History, and Civics and Government. Beginning in the 2012-2013 school year, Keystone Exams in the following subjects were developed by the [PDE] and made available for use by school districts . . . and charter schools, including cyber charter schools:

Algebra I
Literature
Biology

The Keystone Exams are one component of Pennsylvania's statewide high school graduation requirements. Keystone Exams will help school districts guide students toward meeting state standards.

https://www.education.pa.gov/K-12/Assessment%20and%20Accountability/Pages/Keystone-Exams.aspx (last visited 3/6/19). The Keystone Exams replaced the 11th grade PSSA tests.

**low percentage of students scoring proficient or better on the PSSA** constitutes a failure to satisfy Chapter 4 student performance requirements and **is a valid ground for nonrenewal of a school's charter under Section 1729-A(a)(2) of the [CSL] where the charter school's proficiency rates are lower than those of its school district's schools as a whole and no clear pattern of significant improvement** in its PSSA results is shown.

*New Hope Acad.*, 89 A.3d at 737 (citations and footnote omitted; emphasis added).

During the 2011-2012 school year, RSHS was in its sixth year of "corrective status" for AYP. SPP scores and Keystone Exam proficiency percentages for RSHS students during the subsequent school years were as follows:

| RSHS | 2012-2013 | 2013-2014 | 2014-2015 | 2015-2016 |
|---|---|---|---|---|
| SPP Score | 54.5 | 60.2 | 65.2 | 72.8 |
| Literature Proficiency | 53.04% | 64.22% | 63.08% | 60.40% |
| Algebra Proficiency | 44.01% | 50.20% | 58.36% | 50.71% |
| Biology Proficiency | 16.08% | 18.80% | 25.68% | 42.80% |

*See* R.R. at 48a, 219a.

In contrast, during the 2011-2012 school year, I-Lead did not make AYP, and its status was "Warning." I-Lead's students' SPP scores and Keystone Exam proficiency percentages during those same years were significantly lower than RSHS's as charted:

| I-Lead | 2012-2013 | 2013-2014 | 2014-2015 | 2015-2016 |
|---|---|---|---|---|
| SPP Score | 35.1 | 33.5 | 40.0 | 32.5 |
| Literature Proficiency | 25.81% | 28.13% | 32.79% | 9.52% |
| Algebra Proficiency | 9.68% | 9.38% | 18.92% | 7.69% |
| Biology Proficiency | 6.25% | 9.09% | 10.45% | 0% |

*See* R.R. at 43a, 217a.

17

I-Lead's proficiency rates for the relevant school years were clearly significantly lower than RSHS's rates. In its opinion, while acknowledging I-Lead's lower scores, CAB nevertheless focused on what it found to be a pattern of improvement. CAB recognized I-Lead's students' increasing Literature and Biology Proficiencies each school year from the 2012-2013 school year through the 2014-2015 school year, and a significant increase in Algebra Proficiency between the 2013-2014 school year and the 2014-2015 school year. CAB also relied on a 6½ point increase in I-Lead's 2014-2015 school year SPP score.

However, since the SPP score and academic proficiency percentages for the 2015-2016 school year revealed a marked departure from prior school years, CAB's failure to consider I-Lead's SPP score and proficiencies that year rendered its evaluation incomplete. During the 2015-2016 school year, I-Lead's SPP score dropped from 40.0 to 32.5. Literature Proficiency dropped from 32.79% to 9.52%. Algebra Proficiency dropped from 18.92% to 7.69%. Finally, Biology Proficiency dropped from 10.45% to 0%.[26]

---

[26] The District also contends that CAB failed to consider that RSHS's dropout rate was substantially lower than I-Lead's, and RSHS's cohort graduation rate (students graduating in 4 years) was substantially higher than I-Lead's as illustrated:

| Dropout Rates | 2012-2013 | 2013-2014 | 2014-2015 | 2015-2016 |
|---|---|---|---|---|
| **RSHS** | 13% | 7.61% | 7.9% | 7.46% |
| **I-Lead** | 86% | 38.96% | 23.19% | 10.08% |

| Graduation Rates | 2012-2013 | 2013-2014 | 2014-2015 | 2015-2016 |
|---|---|---|---|---|
| **RSHS** | 61.09% | 66.64% | 71.35% | 64.37% |
| **I-Lead** | 18.33% | 27.10% | 27.44% | 41.49% |

18

This Court agrees that consideration of I-Lead's 2015-2016 SPP data and proficiency rates could alter CAB's conclusions regarding whether SPP and proficiency histories demonstrate a "clear pattern of significant improvement[.]" *New Hope Acad.*, 89 A.3d at 737. However, it is noteworthy that while this Court declared in *New Hope Academy* that "a failure to satisfy Chapter 4 student performance requirements [] is a **valid ground** for nonrenewal of a school's charter[,]" the *New Hope Academy* Court did not hold that such a failure **requires**[27] a school district or CAB to not renew a charter or revoke a charter during the charter's term. *Id*. at 737 (emphasis added); *see also Sch. Dist. of the City of York v. Lincoln Charter Sch.*, 889 A.2d 1286 (Pa. Cmwlth. 2006).[28]

Thus, in conducting its *de novo* review in the instant matter, CAB was free to consider numerous factors and to exercise its independent discretion in reaching its decision. CAB analyzed I-Lead's academic performance and distinguished critical factors as follows:

> I-L[ead] is unique in that it actively recruits students who are 'at-risk' for dropping out of school or failing, and enrolls students who are pregnant, have been adjudicated by the courts, are truant, and/or have significant issues that impede their ability to function in a traditional school setting.
>
> . . . .

---

*See* R.R. at 41a, 43a, 46a, 48a, 224a-225a. **I-Lead consistently and substantially reduced its dropout rates** over the relevant school years (from 86% in the 2012-2013 school year to 10.08% in the 2015-2016 school year). Further, I-Lead's **graduation rate steadily increased** from 18.33% in the 2013-2014 school year to 41.49% in the 2015-2016 school year.

[27] Section 1729-A(a) of the CSL **permits, but does not require**, a school district to revoke or not renew a charter based on the reasons set forth therein.

[28] The Dissent argues that "the Majority's analysis suggests that a direct comparison with [RSHS] is required to determine whether I-Lead's students have achieved the requisite level of academic performance that would allow I-Lead to retain its Charter." Dissenting Op. at 4. The Majority suggests no such thing. The Majority simply cites the law as explained in *New Hope Academy*, and focuses on CAB's failure to consider the 2015-2016 student performance data.

19

The significant factor in deciding if I-L[ead]'s charter should be revoked is whether I-L[ead] has shown that it can increase academic performance in those students that it has undertaken to educate - students who are 'at-risk' for dropping out of school or failing. In fact, I-L[ead] originally applied to provide a charter school to grades 11 and 12. When the [District] granted the charter, it added grades 9 and 10. This changed the need to provide comprehensive high school services that [I-Lead] was not previously prepared to provide. I-L[ead] has improved its attendance rates and has significantly increased its enrollment from 205 to 520.

. . . .

The CSL encourages the establishment of schools to serve a variety of purposes. It was enacted to create a system of independent, mission-driven public schools that operate outside of the school district structure. 24 P.S. § 17-1702-A. Our prior interpretation requiring proficient or above proficient achievement on state standardized tests is not wholly applicable to a case in which the [c]harter [s]chool educates students who are dropouts, at significant risk of dropping out, who have been out of the school system, or who have other significant issues that impede traditional learning such as early pregnancy, a history of crime or delinquency, and social-emotional issues. While academic progress is absolutely expected, it is inappropriate to expect exactly the same achievement on standardized tests when the pool of students and the mission of the charter school is so different from the public school. The comparison between I-L[ead], which serves students in grades nine through twelve, is simply not a perfect comparison with the RSHS which serves students in grades ten through twelve. We do not agree with the [District] that a different grade configuration is 'irrelevant when making that comparison.' Similarly, based upon a review of the evidence, CAB does not agree with the [District] that I-L[ead] has made 'insignificant progress' given its pool of students.

The strong support from community members including a State Representative, a State Senator, a County Commissioner, members of the Reading City Council, and, most especially, parents of students at I-L[ead] is also noteworthy. Taken as a whole, I-L[ead] provides a service

20

to a significant pool of students in this community and should be given more time to improve its academic performance, especially considering that I-L[ead's] . . . revocation proceedings [were instituted] only two years into its five-year renewal.

The facts in this record support the conclusion that I-L[ead]'s students have shown improvement, and CAB believes it should be given additional time because of the at-risk population the charter school serves. Because the legislative mandate of the CSL is to increase learning opportunities for all students and to improve pupil performance of all students, I-L[ead] has this statutory obligation to do so. CAB strongly urges I-L[ead] to continue on the path of improvement.

CAB Op. at 26-28 (citation omitted).[29]

---

[29] The District contends that the record evidence does not support CAB's conclusion that I-Lead targets and educates at-risk students, unique from those at RSHS. Although the record is lacking in specific data on the composition of I-Lead's student body, there is substantial record evidence upon which CAB could have relied in reaching its conclusion. First, the Charter Agreement itself recognizes that "[I-Lead] will provide education for grades 9 through 12[,] **but will give preference in enrollment to [dropout] students consistent with its application.**" R.R. at 331a (emphasis added). Further, when asked "[w]hat would you estimate the percentage of students who were not dropouts at I-L[ead,]" Dr. Tamara Smith, I-Lead's former principal and then-acting chief academic officer, responded: "[I]t's hard to give an exact number. Maybe I might estimate a third – a third, or a little higher." R.R. at 824a. In addition, Castro testified:

[L]ooking at the data[,] . . . there was a significant problem with students exiting the District when they turned 17.

And we believed at the time that there were a . . . significant number of students that had earned significant credits in the 9th and 10th grade, but they were then dropping out, and that we would be able to serve them in the 11th and 12th grade, and this fit very well with our mission to try to help low income learners to go to college.

R.R. at 680a. Castro expounded:

[W]e knew we were focusing on a population that is very low[-]performing academically. We knew that we were trying to reach out to students that were disconnected from [s]chool and that, perhaps, had been out of [s]chool for a[ ]while, and we expected them to be presenting with severe academic deficits.

R.R. at 685a. When asked if I-Lead enrolled such students, Castro stated: "Yes, we certainly did. We got – and even more challenges than could have imagined when we were in the application

The District argues that CAB's analysis is erroneous because it "applied an exception to Chapter 4 standards that the CSL does not condone." District Br. at 38. Specifically, the District contends that CAB erred by disregarding established academic standards because of I-Lead's focus on at-risk students: "Never before has CAB ever taken the position that different standards should apply to such schools, or that these schools should be given a pass on the standards imposed on everyone else." District Br. at 40.

---

phase. . . . I mean the students present not only with severe academic deficits, but with extraordinary social problems[.]" R.R. at 685a.

In response to his representation that I-Lead primarily focused on dropouts, Castro was asked how I-Lead defined that term. He explained:

> Well, I would say we define it in several layers. The first layer would be someone that's . . . not in school, who's still at an age where they [sic] can be in school. So that would be somebody who's 17 and above and who is not in school even though they're [sic] entitled to go to [s]chool until they're [sic] 21 years old.

> So then it would be people that . . . have had a substantial history of truancy. . . – they may be theoretically on the books somewhere, but they're actually not attending school. . . .

> And then the third level would be students who are at risk of dropping out, which would be people who have been in school but are not accumulating credits or are experiencing extremely poor academic performance . . . .

> And then I would add a final tranche to that which is students that are suffering with social issues that are likely to impede their academic engagement[.]

R.R. at 707a. When asked if he "would agree . . . that not every child enrolled by [I-Lead] falls into one of those four categories[,]" Castro replied:

> I actually don't agree with that. I think . . . I would turn it around. I would say that there may be a small minority of students to which those categories do not apply, but I think that it is, in all likelihood, **less than five percent of our population, and that the rest of the population would be very appropriately described by those categories that I just mentioned, fall into at least one, if not multiple of them.**

R.R. at 707a (emphasis added).

Contrary to the District's characterization, CAB did **not** "appl[y] an exception to Chapter 4 standards[,]" but, instead, in conducting its *de novo* review, simply exercised the independent judgment and discretion that the CSL authorizes. District Br. at 38. The record is clear that the CSL did not explicitly mandate that I-Lead's charter be revoked, and CAB considered I-Lead's academic performance, weighed the CSL's purpose, and evaluated I-Lead's mission, student and community benefits and strong community support. Based thereon, with the exception of its failing to consider the 2015-2016 academic performance data, we hold that CAB properly exercised its discretion.

**2. Charter Goals**

The District further argues that CAB failed to consider that I-Lead did not attain the academic goals specified in its Charter Application. Citing to *Graystone Academy Charter School v. Coatesville Area School District*, 99 A.3d 125 (Pa. Cmwlth. 2014), the District asserts that "[a] charter school's failure to achieve its own stated academic goals is also justification for revocation." District Br. at 36. Notably, Section 1729-A(a)(1) of the CSL permits charter revocation or nonrenewal based on "[o]ne or more material violations of any of the conditions, **standards** or procedures contained in the written charter . . . ." 24 P.S. § 17-1729-A(a)(1) (emphasis added).

The Charter Application set forth I-Lead's specific academic goals:

Academic Goal #1

[Literacy and Mathematics]

*Objectives and Performance Indicators:*

- By the end of the school's fifth year of operation, 75% of exiting 12th grade learners will score as Proficient or Advanced on representative, internally

23

administered sections of the reading comprehension and writing components of the PSSA *or* will have increased their literacy skills by at least four functioning levels as measured by the Test of Adult Basic Education (TABE).

- By the end of the school's fifth year of operation, 75% of exiting 12th grade learners will score as Proficient or Advanced on representative, internally administered sections of the mathematical reasoning and computation components of the PSSA or will have increased their mathematics skills by at least four functioning levels as measured by the TABE.

- By the end of the fifth year of the school's operation, 90% of exiting 12th grade learners will have successfully demonstrated reading, writing, and mathematical reasoning and computation skills by completing all relevant aspects of their classroom and experiential learning activities.

R.R. at 322a-323a. The Charter Application further represents:

Academic Goal #2

[Science, Technology, and Social Studies]

*Objectives and Performance Indicators:*

- By the end of the school's fifth year of operation, 75% of exiting 12th grade learners will score as Proficient or Advanced on the science and social studies components of the PSSA.

- By the end of the school's fifth year of operation, 85% of exiting 12th grade learners will demonstrate competence in the areas of word processing, spreadsheets, databases, multimedia and presentations, telecommunication, Internet systems and fundamentals, and critical thinking about social and ethical issues in technology, as measured by success on the TechLiteracy Assessment tool and performance-based assessment rubrics as part of the learner's experiential learning activities.

R.R. at 323a-324a. The Charter Application also proposed academic goals pertaining to leadership skills, cultural and community-related issues, and school-to-career and 21st Century employment competencies.

In addition, the Charter Application included the following non-academic goals:

Non-Academic Goal #1

[I-Lead] learners will attend regularly and punctually all classroom and experiential learning activities.

*Objectives and Performance Indicators:*

- The average daily attendance rate will be at least 85% in the first year of the school's operation, will improve to 90% by the third year, and to 95% by the fifth year, according to daily records kept by teachers (called 'learning facilitators' at [I-Lead]), mentors, tutors, and/or employers.

- The average daily tardiness rate will be no greater than 10% in the first year of the school's operation, will be no greater than 7% in the third year, and no greater than 5% in the fifth year, according to daily records kept by learning facilitators, mentors, tutors, and/or employers.

R.R. at 326a. Other non-academic goals included mediation use, non-violent conflict resolution skills, and parental engagement.

I-Lead's failure to achieve its Charter Application standards is a factor that could impact CAB's revocation decision.[30] Accordingly, in reaching its decision,

---

[30] I-Lead contends that CAB was justified in not considering its performance goals since CAB found that the charter was "not properly granted because the [District] itself unilaterally changed the design and structure of the [c]harter [s]chool by requiring it to serve grades 9 and 10[.]" I-Lead Br. at 35. The Dissent similarly notes that the District "added 9th and 10th grades to the school, grades for which I-Lead had not been prepared to offer." Dissenting Op. at 2. Further, I-Lead argues, even if the Charter Application goals applied, they "required students to 'develop competency' in academic areas, did not require a specific statistical level of achievement, and did not apply until after the school's fifth year of operation." *Id*. **Notwithstanding, I-Lead**

25

CAB should have considered whether I-Lead achieved its goals and, if not, weighed the effect of such failure. CAB is not **required** to uphold the District's charter revocation based on a charter school's failure to achieve such goals. In *Truebright Science Academy Charter School v. Philadelphia School District*, 115 A.3d 919 (Pa. Cmwlth. 2015), this Court held that a charter school's "failure to meet a performance goal set forth in its charter is a valid ground for nonrenewal[,]" but the Court did not **require** charter nonrenewal. *Id*. at 921.

### C. Violation of Other Laws

The District further argues that since I-Lead violated other applicable laws, CAB erred when it granted I-Lead's appeal and ordered the District to sign I-Lead's charter. Section 1729-A(a)(5) of the CSL permits a school district to revoke or nonrenew a charter for "[v]iolation of any provision of law from which the charter school has not been exempted[.]" 24 P.S. § 17-1729-A(a)(5). The District asserts that "[c]ompetent evidence established multiple, material violations of the Sunshine Act, the Ethics Act and the [HQT] requirements over the course of multiple school years[.]" District Br. at 47.

### 1. Ethics Act

The District asserts that the lease between I-Lead, Inc. and I-Lead contains conflicts of interest prohibited by the Ethics Act which, along with I-Lead's

---

**subsequently voluntarily signed the Charter Application** that expressly required it to "observe the provisions of the [Charter Application] . . . ." R.R. at 331a. Further, while it is true that I-Lead's specific academic goals were to be measured after five years of operation, and the District initiated revocation proceedings at the start of I-Lead's fifth operating year, the record was supplemented at CAB's *de novo* proceeding with data for five full years of operation. Thus, it was appropriate for CAB to consider whether I-Lead had achieved the goals stated in the Charter Application for the five-year period including the 2015-2016 school year.

officials' and employees' failure to file financial disclosure statements, merited I-Lead's charter revocation.

This Court has acknowledged CAB's authority to determine Ethics Act violations for purposes of rendering a decision on a charter nonrenewal under the CSL. In *New Hope Academy*, this Court held that "[CAB's] determinations that [the charter school] violated . . . the Ethics Act . . . in it[s] contracts with its founder['s] . . . businesses are likewise supported by substantial evidence and legally valid." *Id*. at 740.

### a. Conflict of Interest

CAB explained:

At issue is the lease between I-L[ead] and I-L[ead], Inc., and the actions of I-L[ead]'s Board of Trustees.[31] The September 23, 2015 Resolution contains two 'charges' for which evidence of the I-L[ead] Board [of Trustees'] actions and involvement in lease transactions would be relevant: (1) I-L[ead] failed to ensure that its operations are independent from that of its management company and/or vendor, I-L[ead], Inc. (the two entities have common board members and/or administrators and do not have a written contract that delineates each entity's responsibilities to the other or payment terms); and (2) I-L[ead] violated the [CSL], the Sunshine Act and its own Bylaws in that decisions relegated to the Board of Trustees are being made by others outside the public realm, 'including decisions about budgeting, contracts and leases . . . .' It is the overlap of board members and administrators involved with both I-L[ead] and I-L[ead], Inc. which is the underlying problem. [] Castro, a board member who served as President of the Charter Board for some period of time, was one of those individuals.

I-L[ead] claims that the lease for 401 Penn Street cannot form the basis of an Ethics Act violation because no benefit

---

[31] The Charter Application "provided that I-L[ead], Inc. Board of Directors would serve as I-L[ead]'s Board of Trustees (Charter Board)." CAB Op. at 12, ¶46.

accrued to I-L[ead], Inc. as result of that lease. I-L[ead], Inc. is receiving rent from I-L[ead] as a result of the lease, but the evidence shows that the rental arrangement entails I-L[ead], Inc. donating back to I-L[ead] any balance remaining after payment of operating costs.

CAB Op. at 31-32 (citations omitted). However, CAB concluded:

It appears that members of the I-L[ead]'s Board [of Trustees] engaged in activities which, on their face, may have constituted a conflict of interest had there been a 'private pecuniary benefit.' 65 Pa.C.S. § 1103(a). A 'conflict of interest' is defined by the Ethics Act as '[u]se by a public official or public employee of the authority of his office or employment or any confidential information received through his holding public office or employment *for the private pecuniary benefit* of himself, a member of his immediate family or a business with which he or a member of his immediate family is associated . . . .' 65 Pa.C.S. § 1102 (emphasis added). Contracts or transactions entered into with businesses associated with public officials must be awarded through an open and public process which is dictated by [Section 1103(f) of the Ethics Act,] 65 Pa.C.S. § 1103(f). Such a process includes prior public notice and subsequent public disclosure of all proposals considered and contracts awarded. 65 Pa.C.S. § 1102. It is the State Ethics Commission which has the authority to remedy noncompliance with the Ethics Act. 65 Pa.C.S. § 1107 (15).

There is no evidence that anyone or any entity was actually enriched by this commingling of relationships between I-L[ead] and I-L[ead], Inc. I-L[ead], Inc. is a not-for-profit operation. It does not provide management services or any other comprehensive services. There is no evidence in this record that I-L[ead] or I-L[ead], Inc. has done business with any *other* charter school in the Commonwealth. The totality of the relationship between I-L[ead], Inc. and I-L[ead] can be summed up in two categories: (1) philanthropy, including zero percent interest loans, contributions, and a below-market lease for real estate; and (2) provisions that the Board of Directors for I-L[ead], Inc. will be the Board of Trustees for I-L[ead]. The [District] did approve an application that specifically placed I-L[ead], Inc. in a supportive role. While the commingling of these

28

entities may appear troubling on its face, **the evidence of this commingling is not sufficient to constitute a statutory reason for revocation**.

CAB Op. at 32-33 (emphasis added; footnote omitted).

The District argues that "CAB's creation of the standard of 'actual enrichment' disregarded *the actual standard* of 'private pecuniary benefit' set forth in [Section 1102 of the Ethics Act,] 65 Pa.C.S. § 1102." District Br. at 56. It further contends that "because CAB made up a standard that does not exist, it overlooked the evidence of commingling and of the receipt of a private pecuniary benefit in violation of the Ethics Act, and determined that there were insufficient grounds to justify charter revocation." *Id*.

> Section 1729-A(a)(5) of the [CSL] **does not provide that a charter must be revoked or cannot be renewed if it is established that a charter school is in violation of the law.** It only provides that 'the local board of school directors may choose to revoke or not to renew the charter' if it finds that a charter school is in '[v]iolation of any provision of law from which the charter school has not been exempted[.] . . .' [T]he [s]chool [d]istrict decided to exercise its discretion and revoke the charter, but that decision is not binding on [CAB].

*Lincoln Charter*, 889 A.2d at 1288 (emphasis added).

Contrary to the District's characterization, CAB did not "ma[k]e up a standard[,]" when opting not to impose sanctions for the alleged Ethics Act violations. District Br. at 56. Rather, its opinion demonstrates that CAB considered the facts, weighed whether the conduct warranted charter revocation under the CSL, and exercised its discretion. District Br. at 56. Accordingly, CAB properly acted within its authority.[32]

---

[32] As *Lincoln Charter* makes clear, CAB was not required to revoke the charter even if it found that I-Lead had violated the Ethics Act.

29

### b. Financial Disclosure Forms

Further, this Court finds no merit to the District's argument that I-Lead's officials' and employees' failure to file financial disclosure statements justifies charter revocation. In *Lincoln Charter*, this Court explained:

> [J]ust because a . . . [b]oard member of a charter school did not file an Ethics Act statement does not mean that the charter school is in violation of the Ethics Act; only the individual board member is in violation because filing is an individual responsibility, not the corporate responsibility of the charter school. Charter schools are required to organize as non-profit corporations. Section 1703-A of the [CSL], 24 P.S. § 17-1703-A. Just like any corporation, the failure of any . . . [b]oard member not to carry out his or her individual responsibility cannot be imputed to the corporation itself. While the [s]chool [d]istrict or [CAB] can take the failure to file Ethics Act statements into consideration in determining governance issues, that **violation cannot be imputed to the charter school so that it can be considered in violation of any law, making its charter subject to non[]renewal or revocation under Section 1729-A(a)(5) of the** [CSL].

*Lincoln Charter*, 889 A.2d at 1288 n.7 (emphasis added). Accordingly, CAB did not err by declining to impute to I-Lead, I-Lead's officials' and employees' failure to file financial disclosure statements.

### 2. Sunshine Act

The District next asserts that CAB erred when it refused to consider I-Lead's alleged Sunshine Act violations as a basis for charter revocation.

Section 1716-A(c) of the CSL, 24 P.S. § 17-1716-A(c), mandates that a charter school's board of trustees must comply with the Sunshine Act. In support of its argument that I-Lead repeatedly failed to comply with the Sunshine Act, the District referenced I-Lead's nonpublic decisions such as its adoption of its annual

budget, expenditures to lease school facilities, employees' hiring and employment termination, decisions to borrow large sums of money and the repayment of such loans. In response, CAB stated: "The courts of common pleas, not CAB, have jurisdiction over open meeting challenges for local agencies. The remedy is a legal challenge within thirty days of an alleged violation of the Sunshine Act[.] There is no evidence on this record that the [District] made such a legal challenge." CAB Op. at 29-30 (citations omitted).

> Notwithstanding, CAB acknowledged:
>
> I-L[ead]'s Board [of Trustees] held only three to four meetings a year, and the [District] introduced copies of every meeting minute supplied by I-L[ead]. The [I-Lead] Board [m]inutes admitted into the record show some attempted compliance with the [CSL]. Six sets of minutes from the 2013-[20]14 school year and half of the 2014-[20]15 school year do show that: (1) each meeting was advertised in accordance with the notice requirements of the Sunshine [Act]; (2) the Board [of Trustees] discussed and approved financial reports, and the school's financial position on the record at each meeting; (3) the Board [of Trustees] created an Executive Committee of the school to handle day-to-day operations and matters arising between meetings of the Board [of Trustees]; (4) the Board [of Trustees] approved restructuring, employee resignations, and staffing requests from the Executive Committee; and (5) the Board [of Trustees] voted on important matters such as amending the by-laws to establish an independent committee for facility negotiations and electing Dr. Natalini as Board [of Trustees] chair.
>
> **I-L[ead] admits to minutes-recording errors in the past and contends that it has worked to correct Sunshine [Act] violations by receiving training on how properly to [sic] record public meeting minutes, and has posted those minutes to its website following each meeting of the Board [of Trustees] since the hearings below. The record shows improvement in this area.**

CAB Op. at 30 (emphasis added; citations omitted). Thus, CAB did consider these issues and found that I-Lead was working in good faith to resolve those issues.[33] Accordingly, the District's argument is meritless.

### 3. Highly-Qualified Teachers

Finally, the District contends that I-Lead's failure to adhere to HQT requirements was further justification for I-Lead's charter revocation, and that CAB failed to give sufficient weight to the issue. The District first maintains that CAB's factual findings are inconsistent with respect to the percentage of I-Lead's HQTs.

Regardless of any inconsistencies in its factual findings, CAB's opinion makes clear that it acknowledged that "I-Lead did not always meet the HQT requirements." CAB Op. at 28. CAB further explained:

> Even the [District] concedes that these violations alone would not be significant enough to warrant revocation of the charter. The employment of HQTs is not a significant, fundamental, or material reason to revoke a charter. . . . These HQT violations should be considered, but only if they constitute a part of a wider pattern of significant violations of law by I-L[ead] will they constitute sufficient evidence to revoke I-L[ead]'s charter. **Therefore, this evidence will be considered along with the evidence of other alleged violations.**

CAB Op. at 29 (citations omitted; emphasis added). Thus, CAB properly considered I-Lead's lack of compliance with HQT requirements. It weighed that evidence as a factor when it exercised its independent judgment and discretion, as permitted by the CSL.[34] Accordingly, this Court discerns no error.

---

[33] Notably, the District denied I-Lead's proposed amendment providing for "compliance training regarding the Sunshine Act and the Ethics Act." CAB Op. at 1.

[34] *See Lincoln Charter*.

## III. CONCLUSION

Based on the foregoing, this Court vacates CAB's order and remands this matter to CAB to consider the matter anew with the inclusion of the following additional information: I-Lead's 2015-2016 academic performance data (including SPP score and Keystone Exam proficiency percentages), its dropout and graduation rates and its compliance with its Charter Application's academic goals. Based thereon, CAB is to render a new decision on the merits.

For all of the above reasons, CAB's order is vacated, and the matter is remanded to CAB for proceedings consistent with this opinion.[35]

_____
ANNE E. COVEY, Judge

---

[35] The Dissent complains that "[d]espite this [Court's observation that the CSL does not require revocation or non[]renewal for failure to meet academic performance standards] and [this Court's] recognition that 'CAB was free to consider numerous factors and to exercise its independent discretion in reaching its decision,' the Majority would still remand this matter for CAB to issue a new decision." Dissenting Op. at 4-5. This Court recognizes CAB's independent discretion, but **it must exercise that discretion properly**, by considering all relevant evidence. It did not do so here.

Further, contrary to the Dissent's assertion that a remand is not necessary because this "Court should defer to CAB's expertise[,]" this Court does not question CAB's expertise. Dissenting Op. at 5. CAB is free to use its expertise when reviewing charter school revocation decisions. However, CAB may not capriciously disregard evidence when doing so.

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Reading School District,         :
              Petitioner   :
                               :
        v.                  :
                               :
I-Lead Charter School,       :    No. 78 C.D. 2018
              Respondent  :

## O R D E R

AND NOW, this 14th day of March, 2019, the Pennsylvania State Charter School Appeal Board's (CAB) December 20, 2017 order is vacated, and the matter is remanded to CAB for proceedings consistent with this opinion.

Jurisdiction is relinquished.


_____
ANNE E. COVEY, Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Reading School District,          :
                 Petitioner     :
                              :
            v.                 :    No. 78 C.D. 2018
                              :    Argued: November 15, 2018
I-Lead Charter School,        :
                 Respondent    :

BEFORE:     **HONORABLE RENÉE COHN JUBELIRER,** Judge
                **HONORABLE ANNE E. COVEY,** Judge (P.)
                **HONORABLE CHRISTINE FIZZANO CANNON,** Judge

**DISSENTING OPINION BY**
**JUDGE COHN JUBELIRER**               **FILED: March 14, 2019**

Because I would conclude the Pennsylvania State Charter School Appeal Board (CAB) did not err or abuse its discretion in holding that the revocation of I-Lead Charter School's (I-Lead) Charter was not warranted based on its holistic consideration of the evidence before it, the alleged violations of, among other statutes, the Sunshine Act,[1] the unique nature and needs of I-Lead's mission and student population, and the considerable community support for I-Lead, I would affirm CAB's Order. Therefore, I must, respectfully, disagree with the Majority's decision to vacate and remand this matter for a new decision.

The purposes of the Charter School Law[2] (CSL) include "[i]mprov[ing] pupil[s'] learning," "[i]ncreas[ing] learning opportunities **for all pupils**," and

---

[1] 65 Pa. C.S. §§ 701-716.

[2] Act of March 10, 1949, P.L. 30, *as amended*, added by Section 1 of the Act of June 19, 1997, P.L. 225, 24 P.S. §§ 17-1701-A—17-1751-A.

"[p]rovid[ing] parents and pupils with **expanded choices in the types of educational opportunities** . . . **available**." Section 1702-A(1), (2), (5) of the CSL, 24 P.S. § 17-1702-A(1), (2), (5) (emphasis added); *New Hope Acad. Charter Sch. v. Sch. Dist. of the City of York*, 89 A.3d 731, 739 (Pa. Cmwlth. 2014). Taking these legislative mandates to heart, I-Lead established its school in 2010 "with a mission to provide former students who had dropped out of school and other at-risk students," such as those who were truant, pregnant, had been adjudicated delinquent by the courts, or had other issues that impacted their ability to function in traditional school settings, "with an educational option to finish high school." (CAB Opinion (Op.) at 1; Finding of Fact (FOF) ¶ 2.) It applied to provide education for only 11th and 12th grades, but when the Reading School District (District) granted the Charter, it added 9th and 10th grades to the school, grades for which I-Lead had not been prepared to offer. (CAB Op. at 26.) Because "[n]inth grade is a significant year in which students drop-out or get off-track," the addition of these grades did not change the focus of I-Lead's mission. (FOF ¶ 36.) I-Lead proceeded with its mission to provide an educational option to at-risk students, beginning with 205 students in the 2011-12 school year, a number that has increased to 520 by 2015. (CAB Op. at 26; FOF ¶¶ 4, 22.) With these legislative purposes and I-Lead's mission in mind, CAB considered the District's decision to revoke I-Lead's Charter five years after it began operating and a mere two years after the District renewed that Charter.

In its decision, CAB acknowledged, as we all must, the importance of a charter school's ability to meet academic performance requirements, stating that "academic progress is absolutely expected." (CAB Op. at 27.) But, CAB also recognized that a **direct** comparison of charter schools and traditional schools as a means of measuring academic performance and improvement **may not be appropriate in all**

**cases**. Without considering, among other factors, the differences in the grade levels served and the unique characteristics and needs of the enrolled student populations, such direct comparisons may become "over-simplified." (*Id.* at 26-27.) In reflecting on such comparisons, CAB reasoned that "it is inappropriate to expect exactly the same achievement on standardized tests when the pool of students and the mission of the charter school [are] so different from the public school." (*Id.* at 27.) Thus, CAB took a holistic approach to resolving the question before it, considering, in addition to the academic performance of I-Lead's students over the years, the particular at-risk student population served by I-Lead, the need for this type of educational option, and the community support for its continued operation. I agree that this approach can be, in some circumstances, an appropriate way of ascertaining whether the revocation of a charter is warranted.

The Majority holds that CAB "deliberate[ly] disregard[ed] . . . relevant evidence by failing to consider the 2015-2016 [School Performance Profiles (SPP)] data in deciding whether to revoke I-Lead's charter," which reflected a decrease in proficiency scores. *Reading Sch. Dist. v. I-Lead Charter Sch.*, __ A.3d __, __ (Pa. Cmwlth., No. 78 C.D. 2018, filed March 14, 2019), slip op. at 14 (internal quotation omitted). However, nothing in CAB's decision suggests to me that it disregarded any particular test score or data set in making that decision. Instead, CAB noted that it had considered all of the evidence before it, **including the supplemental evidence** claimed to have been disregarded by the Majority, and was satisfied that, "given I-L[ead]'s focus and mission to educate at-risk students," I-Lead had made "improvement in student performance in the last several school years." (CAB Op. at 26, 34; Conclusion of Law ¶ 14.) That CAB did not directly cite the statistics from the 2015-2016 School Year in its opinion does not mean CAB disregarded that

evidence. Rather, CAB's decision reflects, and the record supports, that "I-L[ead]'s students have shown improvement." (CAB Op. at 28.) Citing the legislative mandate to increase learning opportunities for **all students**, the student improvement shown, the improved dropout rates, and the strong community support for I-Lead, CAB, in its expertise, concluded that I-Lead "should be given additional time" "to improve its academic performance, especially considering that [the District] instituted revocation proceedings only two years into [I-Lead's] five-year renewal." (*Id.*)

Moreover, the Majority's analysis suggests that a direct comparison with Reading Senior High School (RSHS) is required to determine whether I-Lead's students have achieved the requisite level of academic performance that would allow I-Lead to retain its Charter. *Reading Sch. Dist.*, __ A.3d at __, slip op. at 17-18 and n.26 (comparing the test scores, dropout rates, and graduation rates of I-Lead to RSHS and stating "I-Lead's proficiency rates for the relevant school years were clearly significantly lower than RSHS's rates"). However, as CAB observed in its decision, RSHS does not serve 9th graders, the population that is often most at risk for dropping out of school or getting off track. (FOF ¶¶ 23, 36; CAB Op. at 26-27.) I agree with CAB that a direct comparison of I-Lead and RSHS is not reasonable given their different student populations and missions.

As observed by the Majority, Section 1729-A(a)(2) of the CSL, 24 P.S. § 17-1729-A(a)(2), permits, but **does not require**, the revocation or non-renewal of a charter based on the failure to meet student academic performance standards. *Reading Sch. Dist.*, __ A.3d at __, slip op. at 15, 19. Despite this observation and its recognition that "CAB was free to consider numerous factors and to exercise its independent discretion in reaching its decision," the Majority would still remand this

matter for CAB to issue a new decision. *Id.* at __, slip op. at 19-23. In doing so, the Majority is not saying that CAB must come to a different result, but that it must mention the 2015-2016 School Year scores in its decision. Thus, CAB could still find, as it already has, that revocation of I-Lead's Charter was not warranted given a holistic review of the evidence. Under these circumstances, I believe a remand is unnecessary and that the Court should defer to CAB's expertise and affirm.

Further, I note the practical implications of a remand for CAB to issue a new decision addressing issues that I would conclude have been adequately and correctly resolved in the present decision. CAB's remand decision will likely be followed by another appeal, resulting in the diversion of additional funds that could be otherwise used for the education of both the District's and I-Lead's students. And, continued proceedings challenging I-Lead's operation will continue to cast a shadow on I-Lead's ability to provide additional educational opportunities to the at-risk students it has chosen to educate. These practical implications deserve consideration in determining whether a remand is warranted in this matter.

Finally, I note my agreement with the Majority that the District's argument that CAB erred in refusing to consider I-Lead's alleged Sunshine Act violations is without merit. *Reading Sch. Dist.*, __ A.3d at __, slip op. at 30-32. However, I do so primarily because I agree with CAB that it lacks jurisdiction to consider whether a violation of the Sunshine Act has occurred in the first instance, as such determinations fall within the jurisdiction of the local court of common pleas. (CAB Op. at 29-30); *see* Section 715 of the Sunshine Act, 65 Pa. C.S. § 715 (stating courts of common pleas have original jurisdiction over Sunshine Act challenges); *Graystone Acad. Charter Sch. v. Coatesville Area Sch. Dist.*, 99 A.3d 125, 142 (Pa. Cmwlth. 2014); *Pocono Mountain Charter Sch., Inc. v. Pocono Mountain Sch. Dist.*,

88 A.3d 275, 286 (Pa. Cmwlth. 2014). However, I also agree with the Majority's observation that, notwithstanding CAB's statement, given I-Lead's admitted issues, "CAB did consider these issues and found that I-Lead was working in good faith to resolve" them. *Reading Sch. Dist.*, __ A.3d at __, slip op. at 32.

Accordingly, I would not vacate and remand for a new decision but would affirm CAB's Order.

_____
**RENÉE COHN JUBELIRER,** Judge